**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

UNITED STATES OF AMERICA

      -  v.  -

                                             **No. 17 Cr. 596 (GBD)**

TONY MCCLAM,

            Defendant.

--------------------------------------------------------X

## TONY MCCLAM'S MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTIONS *IN LIMINE*

MIEDEL & MYSLIWIEC LLP
80 Broad Street, Suite 1900
New York, New York 10004
Telephone: (212) 616-3046

Aaron Mysliwiec
*Counsel for Tony McClam*

THE LAW OFFICES OF
CARINE M. WILLIAMS, PLLC
29 Broadway, Suite 1412
New York, New York 10006
Telephone: (212) 653-8321

Carine M. Williams
*Counsel for Tony McClam*

# TABLE OF CONTENTS

I.      **PRELIMINARY STATEMENT**……………………………………  3

II.     **FACTUAL BACKGROUND**………………………………………4

III.    **RULE 404(b) REQUIRES EXCLUSION OF EVIDENCE AS TO (1) PRIOR CONVICTION, (2) WIRETAP-RELATED CONDUCT, (3) DOG ALERT, AND (4) PURPORTED TRAP COMPARTMENT**………………………… 7

        A.  Applicable Law……………………………………………… 7

        B.  Analysis……………………………………………………… 9

              i.    *There is No Proper Purpose*………………………………9

              ii.   *The Prior Acts Are Irrelevant*…………………………… 11

              iii.  *The Prejudice Would Devastate Mr. McClam's Defense*………… 15

              iv.   *Instructions to the Jury Cannot Cure Prejudice*…………………… 19

IV.     ***DAUBERT*, RULE 702, AND RULE 403 FURTHER REQUIRE EXCLUSION OF PROFFERED DOG HANDLER EXPERT TESTIMONY**…………… 19

        A.  Applicable Law……………………………………………… 19

        B.  Analysis……………………………………………………… 23

              i.    Daubert *and Rule 702*…………………………………… 23

              ii.   *Rule 403*…………………………………………………… 28

V.      **RESERVATION OF ADDITIONAL ISSUES**………………………28

VI.     **CONCLUSION**……………………………………………………… 28

## I.     PRELIMINARY STATEMENT

On October 5, 2020, Mr. McClam will proceed to trial. He stands accused of

violating 18 U.S.C § 826, based on Government allegations that he attempted and conspired to

traffic 14 kilograms of cocaine. *See, e.g*., Doc. No. 1, Complaint ("Compl.") ¶ 9. At this point,

it appears the Government's case against Mr. McClam is largely indirect and circumstantial,

and not exceedingly strong.

The pieces of indirect and circumstantial evidence that the Government now

seeks to admit at trial—in the context of case of a targeted drug bust, or sting operation,

***involving the transaction of sham drugs only***—include evidence as to:

> (i)     a March 5, 2019 conviction for criminal possession of a controlled
>         substance;
>
> (ii)    conduct related to an authorized July 2018 through February 2019
>         wiretap which involved discussions as to narcotics transactions, including
>         with purported co-conspirators in California;
>
> (iii)   a dog alert for the presence of narcotic odors in the trunk of the
>         Volkswagen ("VW") Touareg stopped by law enforcement the evening
>         of Mr. McClam's arrest, and;
>
> (iv)    the presence of what the Government alleges is a concealed compartment
>         near the bumper of that same vehicle, or "trap" for smuggling narcotics,
>         which was empty at the time of the stop.[1]

Pursuant to Federal Rule of Evidence ("Rule") 404(b), counsel for Mr. McClam

respectfully moves *in limine* for a ruling that precludes introduction of any evidence or lines of

---

[1]      The Government provided the undersigned with notice that it intends to seek to introduce
evidence regarding Mr. McClam's prior narcotics offense and the wire-tap related conduct pursuant to
Rule 404(b) by letter dated March 27, 2020. That letter is attached hereto as Exhibit A. While the
Government has not noticed evidence of the dog alert and trap compartment as prior bad acts evidence,
the undersigned respectfully submit that—given the circumstances of this case—both fall under the ambit
of Rule 404(b). The Government provided further notice that it intends to call a canine handling Drug
Enforcement Agency ("DEA") Task Force Officer, Frank Aresta, as an expert witness by letter dated
August 18, 2020. That letter is also attached as Exhibit A.

inquiry related to any of these four aforementioned topic areas. Part III of this memorandum in support of Mr. McClaim's motions *in limine* explains how all four *Huddleston* factors—pertaining to purpose, relevance, prejudice, and jury instruction—strongly counsel against admission of evidence or lines of inquiry as to any of: (i) Mr. McClam's March 5, 2019 conviction; (ii) the July 2018 through February 2019 wiretap conduct; (iii) the dog alert; or (iv) the alleged VW Touareg trap compartment.

With respect to the dog alert evidence, Mr. McClam further moves for an *in limine* ruling excluding the Government's proffered expert evidence pursuant to Rules 702 and 403. Trial testimony as to dog sniff alerts in the field—wholly apart from using such alerts as an investigatory tool or for probable cause purposes—is inherently unreliable, and exceedingly prejudicial. The Government proposes to burnish such testimony with no less than the imprimatur of "expertise." Yet the Government cannot establish that this purported expertise has ever been validated through peer-reviewed studies as credible, scientific, or technical evidence; nor that it is otherwise reliable and squarely relevant, and sufficiently probative of guilt or innocence in this case. Part IV of this memorandum explains how the particular circumstances of the dog alert testimony at issue here includes myriad specific indicia of unreliability and undue prejudice which require the Court to preclude the proffered canine handler expert testimony under *Daubert* and its progeny, as well as independently, under Rule 403.

## II.    FACTUAL BACKGROUND

The Government alleges that, at approximately 10:05 PM on May 31, 2017, law enforcement officers observed a white VW Touareg pull into a Ridgefield, New Jersey area rest stop. Shortly thereafter, according to the Government, these officers observed a passenger open

the rear passenger door and saw a Government informant place a suitcase containing 19 bricks of sham powder—which had been made to look like narcotics and provided to the informant by law enforcement officers—on the backseat of the vehicle. Ten minutes later, at approximately 10:15 PM, law enforcement initiated a traffic stop of the vehicle and, upon searching the vehicle, found the suitcase containing sham drugs in the trunk. The driver, a woman named Krystal Gittens; the rear seat passenger (Mr. McClam's co-defendant), a man named Raymundo Leal; and Mr. McClam, who was the front seat passenger, were removed from the vehicle and subsequently arrested.

The Government further alleges that, at approximately 11:15 PM, a dog, "Cedo," reacted for the presence of a narcotic odor; and that, upon further inspection, a concealed compartment near the rear bumper of the vehicle was detected by law enforcement.

Minimal discovery has been produced concerning the background of Cedo to date (supplemental requests were tendered on September 5, 2020). However, the resume provided for Officer Aresta and Cedo indicates that Cedo was born on April 8, 2007 and was, accordingly, over 10 years old at the time of the subject May 31, 2017 VW Touareg search. *See* Resume for PO Frank Aresta, Jr. and K9 Cedo, attached hereto as Exhibit B. The Government alleges that "Cedo was certified to detect the odors of marijuana, cocaine, heroin, ecstasy, methamphetamines, and their derivatives." *See* Compl. ¶ 9(j), n.2. No indication has been provided to date as to any laboratory confirmation of the presence of narcotics in the vehicle (or on the person of Mr. McClam or any other person who had been seen in the vehicle).

The day of the May 31, 2017 incident, Mr. McClam's co-defendant, Mr. Leal, had been in contact with a confidential source ("CS") about a drug transaction. Mr. Leal had also been in contact with the CS in the days and weeks prior to May 31st. And, unbeknownst to

Mr. Leal, the CS was working with law enforcement, consensually allowing his calls to be recorded, and arranged to have sham drugs substituted for real drugs. The Government's case against Mr. Leal all but "air-tight" and, as the Court is aware, Mr. Leal recently pleaded guilty to engaging in a narcotics conspiracy

The evidence against Mr. McClam, however, is nothing like the strong case the Government had against Mr. Leal. Before his arrest on May 31, 2017, Mr. McClam was not a suspect in this investigation and was unknown to the investigating officers. Mr. Leal was the target. When the CS planned the sham drug deal with Mr. Leal at the Lombardi Rest Stop in New Jersey, neither the CS nor the DEA expected Mr. Leal to arrive in a white Volkswagen Touareg, or to be in the company of two other individuals.

Importantly, the testimonies of both Agent McGrath and Officer Colon at the suppression hearing in this case—while contradictory on a number of key details about the transaction—were consistent on the fact that Mr. McClam did not exit the Touareg at the rest stop, and on the fact that he had no discernable role in the transaction. *See* Doc. No. 70, Hearing Transcript ("Tr.") at 17, 59, 104-5. Authorities did not even know Mr. McClam was in the Touareg until they executed a traffic stop on the vehicle and saw him in the front passenger seat.

At the time of Mr. McClam's May 31, 2017 arrest, the *only* evidence linking Mr. McClam to unlawful activity was his presence as a passenger in a vehicle into which an opaque bag—with no indication of its contents—was delivered to another occupant of the vehicle who was seated in a different row. This was not a situation in which the three occupants of the vehicle were observed together engaging in openly unlawful activity (such as passing drugs around). Nor is it even a case in which one passenger was clearly involved in an activity for which knowledge would be necessarily imputed to other passengers in the car (such as shooting a gun through an

open window). Mr. McClam was not the driver of the car. As Agent McGrath testified at the

suppression hearing, he did not have any knowledge as to whether Mr. McClam was even awake

or sleeping at the time the bag was delivered to the vehicle. *See* Tr. at 59-60.

Nor did law enforcement obtain any real new information between Mr. McClam's

arrest and release on May 31, 2017, and his second arrest on August 30, 2017. In response to a

question about what, if anything, the investigators learned between those two dates to justify Mr.

McClam's second arrest, Agent McGrath testified at the suppression hearing that "we were able

to look at the toll records and different information, but the substance of what you're getting at,

there wasn't a lot of information we learned." *See* Tr. at 44-45. Agent McGrath further

"clarified" this statement as follows: "I believe your question previously was what investigative

steps had we done after the initial arrest. My team and I did look at additional toll records to

include Mr. Leal's phone number. I would not say that it contributed more facts based on what

we had uncovered and had done on May 31." Tr. at 48.

### III.   RULE 404(b) REQUIRES EXCLUSION OF EVIDENCE AS TO (1) PRIOR CONVICTION, (2) WIRETAP-RELATED CONDUCT, (3) DOG ALERT, AND (4) PURPORTED TRAP COMPARTMENT

#### A.  Applicable Law

Rule 404(b) provides that the Government "may" admit evidence of prior

uncharged conduct (or allegations of prior bad acts) as offers of "proof of motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid.

404(b). As 404(b) makes clear, however, "[e]vidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show action in conformity therewith."

The "inclusionary approach" generally taken in our Circuit towards Rule 404(b)

evidence is not so broad as to swallow this prohibition whole. Such evidence may only be

admitted (i) "as long as the evidence is not offered to prove propensity," and (ii) if it is neither trumped by the balancing provisions of Federal Rules of Evidence 402 and 403—in other words, if the evidence is relevant and not more prejudicial than it is probative of the purpose for which it was offered. *See U.S. v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984) (reversing the trial court for failure to "balance the probative value of the evidence against its prejudicial impact to determine if the evidence is excludable," and for failing to provide a limiting instruction). *Accord U.S. v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) ("Even under this [inclusionary] approach, however, district courts should not presume that such evidence is relevant or admissible."); *U.S. v. McCallum,* 584 F.3d 471, 475 (2d Cir. 2009) ("Yet this inclusionary approach does not invite the government 'to offer, carte blanche, any prior act of the defendant in the same category of crime.'") (citing *U.S. v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)).

   To guard against over-inclusiveness with respect to Rule 404(b) evidence, the Supreme Court instructs trial courts to consider whether:  (i) the prior acts evidence is "offered for a proper purpose;" (ii) the evidence is relevant to an issue in dispute, pursuant to Federal Rules of Evidence 402 and 104(b); (iii) the probative value "is substantially outweighed by its potential for unfair prejudice" pursuant to Rule 403; and (iv) an appropriate limiting instruction can be crafted, pursuant to Rule of Evidence 105. *Huddleston v. U.S.*, 485 U.S. 681, 691-692 (1988). *See also U.S. v. Frederick*, 702 F.Supp.2d 32, 39 (E.D.N.Y. 2009) (observing that district courts "must be attentive to the potential for 'undermin[ing] the fairness of the trial' with 'classic, and powerful, evidence of propensity,'" (citations omitted), and applying *Huddleston* factors to deny the government's Rule 404(b) motion without prejudice to renew should prior act evidence become relevant to a disputed issue at trial).

### B.  Analysis

As discussed, the Government's case against Mr. McClam depends largely on his presence at a truck stop while his co-defendant got a bag from the CS. There is no direct evidence that Mr. McClam knew about a drug conspiracy and certainly no direct evidence that he knowingly joined it. The Government's case against Mr. McClam is based on circumstantial evidence from which it hopes that a jury will jump to conclude that Mr. McClam knew about and joined the conspiracy between Mr. Leal and the CS.

In the context of such a circumstantial case, the Government will seek to cover for the lack of direct evidence by trying to admit pure "propensity evidence in sheep's clothing" that is highly prejudicial, and not relevant to or adequately probative of the elements that the Government must prove at trial. *See McCallum,* 584 F.3d at 477 (finding that the trial court abused discretion by admitting evidence of two prior narcotics convictions—offered "ostensibly to establish [the defendant's] intent to deal drugs and his knowledge of drug dealing"—with insufficient regard for "the unfair prejudice that surely would result from their admission"). There is an untenable risk in this case that admitting the proposed 404(b) evidence may result in the jury using an improper basis to convict Mr. McClam of the charged crime, even though the Government cannot make out its burden of proof at trial.

### i.  *There Is No Proper Purpose*

First, none of the evidence as to the (i) prior conviction; (ii) wiretap-related conduct; (iii) dog alert; and (iv) alleged trap compartment is offered for a "proper purpose," or for any clearly specified purpose at all.

Instead, as to the March 5, 2019 conviction and the July 2018 through February 2019 wiretap conduct the Government merely asserts, in baldly conclusory fashion, that the

evidence is "direct evidence of the charged conspiracy," and that it is also offered for every possible purpose under the Rule 404(b) sun. *See* Exhibit A (Government notice arguing, in addition to direct evidence, that the prior offenses are admissible as "proof of the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and/or absence of mistake or accident with respect to the charges in the above-referenced case").

       As a threshold matter, there is no basis for concluding, as the Government posits, that either the March 5, 2019 conviction or the July 2018 through February 2019 wiretap conduct constitute "direct evidence of the charged conspiracy." The conduct underlying the March 5, 2019 conviction did not turn on any conspiracy, or even involve a co-defendant—it involved drugs, firearms, and cash found in a Freeport, New York stash house by emergency responders to a fire. The co-defendants involved in the July 2018 through February 2019 wiretap conduct had no affiliation with Mr. McClam's co-defendant in this case. These prior acts are not inextricably linked to the charged conduct but plainly "occurred at different locations, at different times and with different people." *Levy*, 731 F.2d at 1003 ("The argument that an act with these distinctions from the charged offense is not 'other' for the purposes of Rule 404(b) is not persuasive."). As such, "direct evidence" is plainly an improper basis for admission of the prior act evidence at issue in this case.

       With respect to permissible Rule 404(b) purposes, the Government's notice does not at all specify the reason(s) it seeks to admit evidence of Mr. McClam's March 5, 2019 conviction, or the July 2018 through February 2019 wiretap conduct. Yet, Rule 404(b) evidence "should be aimed at a specifically identified issue." *U.S. v. Figueroa*, 618 F.2d 934, 939–40 (2d Cir.1980) ("This enables the trial judge to determine whether the issue sought to be proved by the evidence is really in dispute and, if so, to assess the probative worth of this evidence on this

issue against its prejudicial effect."). There is, accordingly, no meaningful way to assess whether the prior narcotics related activity which the Government now proposes to admit into evidence at trial might be "proper." *Cf. U.S. v. O'Connor*, 580 F.2d 38, 40 (2d Cir. 1993) ("The Government, [the Second Circuit has] emphasized, must do more than disclaim an intention of proving that the defendant is a bad man"); *Levy*, 731 F.2d at 1002 ("The government, however, must explain in detail the purposes for which the evidence is sought to be admitted.").

Because no specified purpose is tantamount to an improper purpose, the prior acts evidence at issue in this case may not be admitted.

The Government has not offered any Rule 404(b) notice as to the dog, or the alleged trap compartment. More recently the Government has obliquely averred that both are "among other things" relevant to Mr. McClam's intent and knowledge. And yet, as is discussed further *infra* there is no factual nexus linking either the alleged narcotics odor signaled by the dog, or the purported trap compartment to this case. In fact, no drugs were actually found in the vehicle (only the Government's sham narcotics), and there is no evidence indicating that the alleged trap compartment was used or even could have been used to store the suitcase containing 19 bricks of sham narcotics. Accordingly, at best, any narcotics odor and the alleged trap compartment likewise constitute prior act evidence—evidence that the vehicle was, at some point in the past, used to transport actual narcotics—and Rule 404(b) notice is required.

#### ii.    *The Prior Acts Are Irrelevant*

Consistent with the requirements of *Huddleston*, this Circuit has made clear that it is necessary but not sufficient to have a proper purpose:  "[t]he government must [also] identify a similarity or connection between the two acts that makes the prior act relevant to establishing" the specified, proper purpose. *Garcia*, 291 F.3d at 137-138 (2d Cir. 2002); *Curley*,

639 F.3d at 57 (2d Cir. 2011) ("To satisfy the relevance inquiry, the [Rule 404(b)] evidence must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [specified Rule 404(b) purpose, *e.g.*, motive] inference advocated by the proponent of the evidence."). *See also O'Connor*, 580 F.2d at 40 ("[T]he prosecutor must show that the evidence is relevant, and there is no presumption that it is[.]").

On this second *Huddleston* step the Government likewise falters. Indeed, the Government's notice in connection with Mr. McClam's March 5, 2019 conviction and the July 2018 through February 2019 wiretap conduct makes no attempt to articulate relevance. But even the superficial details offered by the Government as to these prior acts make plain that neither is even tangentially relevant to any possible permissible Rule 404(b) purpose. There is no consequential similarity or connection between these prior acts and the instant case, nor any key link that might allow a jury to draw a permissible inference about Mr. McClam's motive, opportunity, intent, preparation, plan, knowledge, identity, and/or absence of mistake or accident in this case.

Regarding this point, the Second Circuit's decision in *U.S. v. Garcia*, 291 F.3d 127 (2d Cir. 2002) is instructive. In *Garcia*, the panel concluded unanimously that the trial court abused discretion when it admitted evidence of a prior drug transaction to show knowledge of coded language that was used in the charged transaction, notwithstanding that the Government "made no attempt to link the transaction on that basis." *Id.* at 138. As the panel emphasized, "[w]ithout a connection between the two acts, the prior act is not relevant or probative and is inadmissible." *Id.* at 138.

Importantly, in *Garcia*, the panel noted that the only similarity between the prior act evidence at issue there and the charged drug transaction was "that both involved cocaine."

*Id.* Not even that much is so here. While the instant case involves cocaine, Mr. McClam's March 5, 2019 conviction involved heroin, fentanyl, marijuana, firearms, and cash; the July 2018 through February 2019 wiretap conduct culminated in the seizure of heroin, fentanyl and marijuana. *Accord U.S. v. Robinson*, No. 17-CR-249, 2017 WL 4466616 *3 (S.D.N.Y. Oct. 5, 2017) (rejecting as irrelevant four prior crack convictions pursuant to a Rule 404(b) analysis, notwithstanding that underlying charges also involved crack because other similarities advanced by the government—including that certain of the prior acts also "involved cash and a late hour," "involved the presence of others," and/or likewise occurred in the Bronx—were "too trifling to be revealing" of any issue in dispute).

  *U.S. v. Gordon*, 987 F.2d 902 (2d Cir. 1993) further compels the conclusion that the requisite relevance for purposes of a Rule 404(b) analysis does not exist in this case. In *Gordon*, the Second Circuit concluded that it was error to admit evidence as to an offense committed 16 months prior to the charged conduct because, while the defendant admitted that he had intended to pick up the government's cooperator from John F. Kennedy Airport, he denied knowing that the cooperator was importing narcotics. *Id.* at 909. "Though there was other evidence to contradict that claim," the Circuit vacated the conviction because the prior act evidence, "itself did virtually nothing to prove that [the defendant] knew [the cooperator] was importing narcotics," and the government's case was not otherwise overwhelming. *Id.*

  To the extent *Gordon* is distinguishable here, as in *Garcia*, the distinction serves only to underscore Mr. McClam's point regarding the *dis*similarities between the March 5, 2019 conviction and the July 2018 through February 2019 wiretap conduct, and his alleged conduct in this case:  the prior act evidence and charged conduct in *Gordon* at least all involved the same type of drug (cocaine). Even that much similarity, inadequate as it was in *Gordon*, is

absent here.

        *Gordon* otherwise closely parallels this case. For example, as in *Gordon,* the Defense in this case does not intend to contest that Mr. McClam and Leal knew each other or that he was present when Leal attempted to engage in narcotics trafficking activity at a New Jersey truck stop. The Defense intends to contest: (1) that Mr. McClam knew Leal was attempting to traffic in narcotics and (2) that Mr. McClam conspired with Leal to do so.[2] Because the prior act evidence on which the Government seeks to rely at trial—all of which ultimately involved drugs seized from New York properties allegedly owned by Mr. McClam— does "virtually nothing" to prove Mr. McClam knew about Mr. Leal's New Jersey truck stop intentions, it would likewise be error to admit that evidence here. Moreover, because the Government's case here is likewise not overwhelming, there would be no way to have confidence that "the jury's judgment was not substantially swayed" by such error. *Id.* (explaining why vacatur was warranted) (internal quotations and citation omitted); *see also id.* at 910 (Pollack, J., concurring) (cautioning against the dissent's "suggestion that conformity with Rule 404(b)'s similarity standard does not need to be scrupulously respected in cases involving narcotics," because such a "double standard" would foster precisely the sort of propensity inferences that Rule 404(b) is designed to avoid).

        Nor do any links exist between either the alleged narcotics odor or the presence of a trap compartment in the VW Touareg which might allow a jury to draw a permissible inference about Mr. McClam's motive, opportunity, intent, preparation, plan, knowledge,

---

[2]    Nor does Mr. McClam intend to claim that he has never before had a motive, opportunity, intent, preparation, plan, or adequate knowledge to engage in narcotics trafficking activity. *U.S. v. Ortiz*, 857 F.2d 900, 903-904 ("[A] defendant may completely forestall the admission of other act evidence […] by 'express[ing] a decision not to dispute that issue[.]'" (citing *U.S. v. Figueroa*, 618 F.2d 934, 942 (2d Cir.1980)).

identity, and/or absence of mistake or accident in relation to the May 31, 2017 transaction, or the charged narcotics conspiracy.

Even assuming the VW Touareg was used as an instrumentality of some sort of narcotics transport at some point prior, there is simply no link to the conduct charged here. While evidence of contemporaneous drug activity is often admitted in connection with a drug conspiracy charge, nothing ties the alleged narcotics odor or trap compartment here to the events of May 31, 2017, or the charged criminal conspiracy—or even to Mr. McClam, specifically. There will be no testimony, for example, that the Touareg in question was surveilled in other drug transactions relevant to the charged conspiracy, or otherwise discussed in the wiretapped conversations relevant to the conspiracy. Accordingly, this evidence "is insufficient for a jury to reasonably conclude that [Mr. McClam] engaged in the alleged other crimes, wrongs, or acts." *See U.S. v. Daniels*, 2009 WL 1565873, *4 (E.D.La. 2009) (excluding evidence of a dog alert to the presence of narcotics on $18,000 in currency found in a vehicle during a traffic stop where the defendant was charged as a felon in possession, after also observing that "[t]he government has not supplemented the alert with the results of a laboratory test, nor has it supplied any information relating to the accuracy of dog alerts generally.")

### iii.    *The Prejudice Would Devastate Mr. McClam's Defense*

With respect to the third *Huddleston* factor, the Government's notice again falls flat. The Government makes zero effort to explain how probativeness here might "significantly outweigh" prejudice. Yet "[t]he Second Circuit has instructed that the third *Huddleston* prong demands a 'particularly searching, conscientious scrutiny' in the context of prior crimes evidence because such evidence poses a particularly severe risk of unfair prejudice." *Frederick*, 702 F.Supp.2d at 39 (citing *McCallum*, 584 F.3d at 476).

As discussed with respect to the March 5, 2019 conviction or the July 2018 through February wiretap related conduct, the Government failed to specify which permissible Rule 404(b) purpose these prior acts are probative of—according to the Government, the answer is literally everything. There is therefore no way to actually assess whether purported probativeness "substantially outweigh[s]" the risk of unfair prejudice. *Huddleston*, 485 U.S. at 691. As discussed *supra*, however, the dissimilarities between these prior acts and this case necessarily renders any possible probative value, at best, marginal. *U.S. v. Jadusingh*, No. 18-CR-257, 2020 WL 207950, *4 (E.D.N.Y. Jan. 14, 2020) ("[T]he contrast between Ms. Jadusingh's prior attempt [to export narcotics] and the instant action renders her prior attempt to be of only limited probative value in this action.").

At the same time, unquestionably, evidence of Mr. McClam's involvement in high volume heroin, fentanyl, and marijuana distribution; cash stash; and prior possession of firearms would be devastatingly prejudicial—in several different ways.

First, the admission of such evidence would leave Defense counsel to make a Hobson's choice between trying to mitigate the risk of juror confusion by providing jurors with the context that crucially distinguishes those cases from this one, and trying to not further aggravate prejudice to Mr. McClam. *See Levy*, 731 F.2d at 1004 (discussing the risks of prejudice attendant to evidence that might be related to the charged conduct but which occurred "at different times, different places, and with different people," including that, "the defendant would necessarily have to defend against crimes or acts not named in the indictment or not arising from the same transactions giving rise to the crimes named in the indictment," and that "[t]he jury might base its decision, not on the defendant's guilt of the charged crime, but on the defendant's tendency to commit crime); *see also U.S. v. Crumble*, No. 18-CR-32, 2018 WL

2016852, *2 (E.D.N.Y. 2018) ("[A]ny evidence that merely tends to establish that [a defendant] is a drug dealer raises the possibility that the jury will take it as propensity evidence.").

In addition, because these prior acts involve a conviction, they are "far more likely to be received as potent evidence of propensity than other prior bad acts routinely offered under Rule 404(b) because they bear the imprimatur of the judicial system and indicia of official reliability." *McCallum*, 584 F.3d at 476; *id*. at 475 (evidence of a prior conviction "easily lends itself to generalized reasoning about a defendant's criminal propensity and thereby undermines the presumption of innocence.").

Worse yet, the conviction is not yet final. Currently a motion to set aside the March 5, 2019 verdict pends before the Nassau County Criminal Term. That motion is based on compelling challenges to the constitutionality of precisely the same wiretap related evidence that the Government now seeks to use here. *See* Affirmation in Support of Motion to Set Aside Verdict Pursuant to CPL § 330.30(1) (attached hereto as Exhibit C). In light of the state court procedural posture, the admission of any such evidence additionally prejudices Mr. McClam to the extent it would require the Court to expand pretrial proceedings so as to include a mini-suppression hearing on the satellite issues of (i) the constitutionality of the state wiretap, and (ii) the excludability of evidence which flowed from the wiretap (including evidence obtained as a result of search warrants granted on the basis of the wiretap); or otherwise requires a mini-trial on the reliability of the conviction.[3] *See, e.g.*, *Fitzpatrick v. Am. Int'l Grp., Inc.*, No. 10-CV-142, 2013 WL 5912236, *3 (S.D.N.Y. Nov. 2, 2013) (declining to take on "mini-trials on satellite issues" as the admission of proffered Rule 404(b) evidence would have required); *U.S. v.*

---

[3]     Any such mini-suppression hearing would be particularly problematic from a comity perspective, since the state court has not yet ruled on these pending constitutionality questions.

*Gardell*, No. 00-CR-632, 2001 WL 1135948, *6 (S.D.N.Y. Sept. 25, 2001) (excluding proposed Rule 404(b) evidence where it would "likely assume disproportionate significance at trial," require a "mini-trial" and "engender confusion among the issues").

Finally, the prejudice to Mr. McClam would be further aggravated because the offenses involved are unquestionably more sensational and disturbing than the conduct alleged here—they involved high volumes of especially dangerous, stigmatizing narcotics which have been all over the news in recent years (heroin and fentanyl). *See*, *e.g.*, Emma E. McGinty, et. al., *Stigmatizing Language in News Media Coverage of the Opioid Epidemic:  Implications for Public Health*, Preventative Medicine, Vol. 124 (July 2019) at 110, 114; Seth Clark, et. al., *Keeping the Fentanyl Narrative Accurate*, Rhode Island Medical Journal, Vol. 102:9 (Nov. 2019) at 11-12 (discussing "extensive media coverage of the United States (U.S.) opioid epidemic" and speculating that such coverage has left laypersons "unduly concerned" about the risks of illicit fentanyl). *See also U.S. v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (the prejudicial effect of Rule 404(b) evidence is reduced when it does "*not* involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged") (emphasis added).

Given the limited probative value; the waste of judicial economy and risk of inconsistent rulings that would result from litigating the constitutionality of wiretap related evidence; as well as the considerable dangers of jury prejudice and confusion, evidence related to the March 2019 conviction and the July 2018 through February 2018 wiretap related conduct that the Government now seeks to admit in this case should be excluded pursuant to Rule 404(b) (and pursuant to Rule 403).

The alleged dog alert for narcotics odor and trap compartment do not involve

prior convictions, or necessarily relate to offenses more sensational than the conduct alleged here. However, as is discussed further *infra*, given the lack of probative value of this evidence, there is a powerfully prejudicial risk that jurors will infer that—merely because Mr. McClam was a passenger in a vehicle presumably used to transport narcotics at some point before his arrest—Mr. McClam has some greater propensity for participating in narcotics conspiracy.

### iv.   *Instructions to the Jury Cannot Cure Prejudice*

As to the final *Huddleston* factor, Mr. McClam respectfully submits that there is no limiting instruction which would cure the prejudice that would result from the admission at trial in this case of evidence as to (i) his March 5, 2019 conviction; (ii) the July 2018 through February wiretap conduct; (iii) the dog alert for narcotics odor; or (iv) the alleged trap compartment. Nor is there any instruction which might otherwise mitigate the high risk of jurors improperly using any such evidence. *Krulewitch v. U.S.*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, […] all practicing lawyers know to be unmitigated fiction." (internal quotations and citations omitted)).

## IV.   *DAUBERT*, RULE 702, AND RULE 403 FURTHER REQUIRE EXCLUSION OF PROFFERED DOG HANDLER EXPERT TESTIMONY

### A.  Applicable Law

Purportedly expert testimony may not be accepted by a trial court for jury submission in the absence of rigorous vetting for reliability as well as relevance. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993) (instructing that district courts must determine that expert testimony "both rests on a reliable foundation and is relevant to the task at hand"). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999) (describing the inquiry into both reliability and relevance as a "gatekeeping obligation").

To assess reliability, courts consider whether the proffered evidence can be scientifically validated; whether there has been peer review and publication regarding the theory or technique at issue; error rates; and general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593 (clarifying that while there is "no definitive check list or test" for sussing out the reliability of proffered expert testimony, these general considerations are appropriate).

Consistent with this guidance, Rule 702 provides that expert testimony is admissible only:

> if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

The Supreme Court has acknowledged the tremendous difficulties of scientifically validating the field performance of drug sniffing dogs, or otherwise assessing error rates or reliability:

> Errors may abound in [field performance] records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives.

*See Florida v. Harris*, 568 U.S. 237, 245–46 (2013). Given, specifically, the far lower "common sense standard of probable cause" the Court has allowed that certification and

training program records may provide sufficient grounds for trusting a dog's alert for purposes of establishing probable cause. *Id.*at 246. Still—even in the more flexible probable cause context—the Court emphasizes that "circumstances surrounding a particular alert may undermine the case" for trusting a particular dog. *Id.* at 247 (offering as an example scenarios wherein reliability for probable cause purposes may be undermined, including, "if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions").

Where dog sniff evidence has been admitted for the high stakes purpose of helping jurors determine a material fact in issue beyond a reasonable doubt, the Second Circuit has stressed the importance of corroborating evidence. Over twenty years ago, in the arson context—wherein the Government proposed to offer the testimony of an accelerant detection dog handler—the Second Circuit acknowledged studies and industry guidelines that put the reliability of canine accelerant detection starkly into question, but found admission was not an abuse of discretion because "there was substantial additional evidence offered at trial demonstrating that an accelerant was used by the defendant to start the fire." *United States v. Marji*, 158 F.3d 60, 63 (2d Cir. 1998) (observing that sources calling into question the reliability of canine accelerant detection "suggest that special weight should not be assigned to dog-sniff evidence in the absence of any corroborating evidence").[4] *See also U.S. v. Hildenbrandt*, 207

---

[4]     As to this point it must be noted that, since *Marji*, the "science" of canine accelerant detection has been soundly debunked and linked to a disturbing number of wrongful conviction cases. *See, e.g.*, Caitlin Plummer & Imran Syed, *Shifted Science and Post Conviction Relief*, 8 Stan. J. Civil Rights and Civil Liberties 256, 262 ("[F]alsehoods […] perpetrated by pseudo-scientists testifying as experts in countless arson cases […] likely led to the conviction of hundreds of innocent people."); Paul C. Giannelli, *Junk Science and the Execution of an Innocent Man*, 7 N.Y.U. J. Law & Liberty 221 (2013) (discussing the wrongful execution of Cameron Todd Willingham); Paul Bieber, *Anatomy of a Wrongful Arson Conviction: Sentinel Event Analysis in Fire Investigation,* available at https://www.researchgate.net/publication/270284259_ANATOMY_OF_A_WRONGFUL_ARS ON_CONVICTION_SENTINEL_EVENT_ANALYSIS_IN_FIRE_INVESTIGATION (paper

Fed. App'x. 50, 52 (2d Cir. 2006) (finding no abuse of discretion where dog's alert for accelerant "was also substantiated by other evidence"); *U.S. v. Graham*, No. 08-CR-6259L, 2011 WL 1457131, *16 (W.D.N.Y. Apr. 8,2011) (in a gun, or nitrate odor, detection case, admitting expert testimony of handler where dogs at issue had been properly certified, trained, and maintained, and where the court found ample corroboration for the presence of a firearm in the car, including *inter alia* that the car fit the description of the vehicle used in multiple local armed robberies and that a gun was ultimately recovered from the driveway where the defendant was apprehended). *Accord U.S. v. Myers*, No. 10-CR-00039, 2010 WL 2723196 (S.D.W.Va. 2010) (excluding canine handler testimony as to accelerant detection where the government failed to provide sufficient "evidence regarding the general acceptance, standard, or testing of canine searches" and given the lack of corroborating forensic testing, which "did not support the findings of the canine search").

Pursuant to Rule 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

Rule 403 scrutiny is uniquely important in the context of proposed expert testimony, given the undue weight that jurors may accord such evidence. *See Daubert*, 509 U.S. at 595 (quoting Judge Weinstein, then District Court Judge for the Eastern District of New York for the proposition that, "[b]ecause of this risk, the judge in weighing possible prejudice against probative force under Rule 403 […] exercises more control over experts than over lay

---

originally presented at the 2014 International Symposium on Fire Investigation, Science and Technology, finding that in two-thirds of the thirty arson exonerations studied, the original convictions were based on untested and unreliable forensic methods).

witnesses") (internal quotation marks and citation omitted).

**B.  Analysis**

   *i.*   **Daubert *and Rule 702***

   As a general matter, as a Massachusetts survey of the role of forensic sciences at trial has put it:

> Both canines and canine handlers should be approached with
> skepticism—many handlers will present themselves as
> experts, but, neither handler nor dog should be considered an
> expert in any sniff context. […] The heavy reliance on the
> trainer's interpretation, and the reliability of the dog, place
> canine sniff testimony well outside the realm of experts.

Nancy T. Bennett and Anne Goldbach, *Forensic Science and Expert Testimony*, Massachusetts Criminal Practice, Chapter 12, at 58 (2011), *available at* https://www.suffolk.edu/law/faculty-research/faculty/faculty-forms-and-resources/massachusetts-criminal-practice (further comparing canine alerts to polygraph tests, and discussing how handler bias can give rise to conscious or subconscious cuing).[5]

   Indeed, with respect to considering the reliability of the dog alert testimony at issue here, interview notes produced pursuant to the Government's 18 U.S.C. § 3500 obligations indicate that Officer Aresta would likely concede that he does not test or otherwise validate the reliability of his dog's field performance.  *See* Exhibit D (notes indicating that Officer Aresta represented he "can't" track field performance "b/c unlike training, [he] doesn't know whether something was there previously").  *But see U.S. v. Bentley*, 795 F.3d 630 (7th Cir. 2015) (declining, in the context of a probable cause challenge, to find abuse of discretion in the

---

[5]  The undersigned notes that, while Mr. McClam strongly opposes the admission of any dog sniff testimony for the reliability, relevance, and prejudice reasons discussed herein, any such evidence may be treated as lay person opinion testimony at best. *See* Fed. R. Evid. 701.

trial court's decision not to suppress drugs found as a result of a dog alert even where the dog had an exceptionally high (93%) field alert rate, and a low field accuracy rate (59.5%), and warning: "We hope and trust that the criminal justice establishment will work to improve the quality of training and reliability of the animals they use, and we caution that failure to do so can lead to a suppression of evidence.").

While the discovery produced to date substantiates that Officer Aresta and Cedo were annually recertified, no records have been produced as yet with respect to the dog's scoring and maintenance training. As the Scientific Working Group on Dog and Orthogonal Detector Guidelines ("SWGDOG") provides, "written documentation of the dog's ongoing training is an important element in establishing the dog's reliability." *See* Kenneth Furton, et. al., *The Scientific Working Group on Dog and Orthogonal Detector Guidelines (SWGDOG)*, at Appendix 6.2, *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/231952.pdf; *see also id.* at Appendix 11.3.6 (instructing that canine-handler teams "shall spend a minimum of 4 hours per week" in ongoing training).

In any event, while a handler and her dog's certification, training, and maintenance may provide adequate grounds for trusting a canine's field alert in the probable cause context, *Daubert* and Rule 702 unquestionably call for more. Under the rigorous inquiry required of proposed expert testimony, the proffered testimony of Officer Aresta is not admissible.

As current scientific literature documents with respect to dog sniff field performance: "accurate detection appears to be dependent on drug type, and various biological, environmental, behavioral, and physiological factors." Jay M. Poupko, *et al.*, *Drug Contamination of U.S. Paper Currency and Forensic Relevance of Canine Alert to Paper*

*Currency*, 63 J. Forensic Sci. 1340, 1342 (2018) (discussing, *inter alia*, how significantly lower false alert rates have been observed with respect to marijuana detection as compared to detection for amphetamines, cocaine, or heroin; how dogs are generally "more accurate alerting outdoors than around and inside automobiles"; and how handler beliefs as to the presence of a drug odor can result in false alerts); *see also id.* at 1345 (discussing the absence of properly controlled studies in realistic field environments using large numbers of canine-handler teams and concluding that, given the considerable variables impacting reliability, canine alerts with respect to paper currency should only be considered "a preliminary positive field test" and should be followed up with confirmatory laboratory testing); Lisa Lit, *et al.*, *Perceived Infallibility of Detection Dog Evidence: Implications for Juror Decision Making*, Criminal Justice Studies, at 3, available at https://www.researchgate.net/publication/330647785_Perceived_infallibility_of_detection_dog _evidence_implications_for_juror_decision-making (observing that dog detection warrants further empirical research "because prior studies have demonstrated that the issuance of a dog detection alert, as well as the subsequent human interpretation of detection dog activity, is ultimately affected by a range of cognitive and behavioral factors such as handler stress […], handler bias […], training methods […], and context […].") (citations omitted).

Importantly, such variables are squarely of concern here. Cedo's alert was, for example, in and around a vehicle, and offered under *targeted* drug bust circumstances, after the passengers of the vehicle were arrested—making error and the handler's cognitive bias more likely.  Further, notes produced by the Government indicate that Officer Aresta will, "if [his] dog is having trouble," proceed to point to particular areas for the dog to sniff, instead of allowing the dog to be free to sniff on his own, *see* Exhibit D—a practice which may give rise to cuing.

*See*, *e.g.*, Lisa Lit, *et al.*, *Handler Beliefs Affect Scent Detection Dog Outcomes*, 14 Animal
Cognition 387, 388 (2011) (noting that "[d]ogs can further distinguish the focus of human
attention, using other visual cues such as pointing, gazing, head nodding in the direction of a
target, glancing at a target and head turns toward a target affect selection of a target object by a
dog.") (citations omitted).

   Handler bias requires intensely rigorous scrutiny under such conditions.  This is so
not only because dog handlers may in the first instance "cue" a dog to give a particular signal—
subconsciously or not. But also because "[n]either court nor jury can have any means of knowing
why the dog does this thing or another," without the handler's interpretation. *See People v. Cruz*,
643 N.E.2d 636, 662 (Ill. 1994) (rejecting evidence of human scent detection by dogs, and
observing that the "conclusions of the bloodhound are generally too unreliable to be accepted as
evidence in either civil or criminal cases") (internal quotations and citations omitted).

   On this point, a 2011 study substantiating the impact of handler beliefs as to the
presence or absence of a target scent on error rates bears elaboration. Dog handlers were misled
by researchers to believe that several target locations contained drugs or explosive scent markers
when, in fact, none did. *See* Lisa Lit *et al.*, 14 Animal Cognition at 390. While all dogs used in
the study (18) were well trained and certified, they made a whopping total of 225 false alerts
throughout the study (only 15% of the 144 search runs made by these dogs were completed
without a false alert). The combined efforts of these dogs were less accurate than a coin flip.

   The fact that there is scant corroborating evidence supporting the Government's
theory that the VW Touareg at issue was used to transport actual drugs should give the Court
further cause for concern.  Not only is it the case that no drugs were recovered, but no
confirmatory laboratory testing was conducted for drug residue. Nor does the car fit a

description of any vehicle known to have been used in the course of the charged conspiracy, or to have been discussed on the numerous audio recordings over the years-long course of surveillance.

The lack of corroboration is particularly meaningful given the unreliability of the Government's proffered dog sniff evidence. Even if we accept that Cedo correctly alerted to the odor of narcotics—and, as discussed *supra*, there are woefully insufficient reasons to do so here—it may well be that non-contraband item(s) explain the alert. *See, e.g.*, *U.S. v. Funds in the Amount of $100,120.00*, 730 F.3d 711 (2013) (discussing the ways in which paper currency can be innocently contaminated by narcotics, and observing that, "the probative value of dog sniffs is, at most, minimal") (citation and internal quotation omitted); *Horton v. Goose Greek Indep. Sch. Dist.*, 690 F.2d 470 (5th Cir. 1982) (where detection dogs alerted to two students, but upon a full search of their belongings the only item discovered was a bottle of perfume that likely contained methyl benzoate, a by-product of cocaine).

Nor has the Government adequately established relevance, as *Daubert* and its progeny require. Even assuming the VW Touareg was used in the past to transport contraband, there is no foundation establishing that the contraband was cocaine—the object of the conspiracy here—as opposed to marijuana (to which Cedo is also trained to alert). Moreover, even if we could have certainty that it was cocaine, the Government has not linked custody and control over the car to Mr. McClam (as discussed, a passenger in the vehicle at the time of his arrest).

Under these particular circumstances, *Daubert* and Rule 702 counsel that the lack of reliability *and* relevance require exclusion of the Government's proffered expert dog handler testimony.

27

*ii.*   ***Rule 403***

"Jurors have faith in the 'mythic infallibility of the dog' and believe in the accuracy of dog performance despite scientific evidence to the contrary." Lisa Lit, *et al.*, *Perceived Infallibility of Detection Dog Evidence: Implications for Juror Decision-Making*, Criminal Justice Studies at 2.

The risks of prejudice to Mr. McClam by the admission of Officer Aresta's proffered expert testimony are intolerably high. No jury instruction can mitigate the risk that jurors will conclude that, because Mr. McClam was a passenger in a vehicle they know (with quite likely misplaced scientific confidence) was once used to transport drugs, then he must have knowingly associated with or participated in the conspiracy which gave rise to the May 31, 2020 sham drug transaction when he joined his co-defendants in the car as a fellow passenger. Nor are these risks counterbalanced by compelling corroboration or high probative value for any material fact in dispute.

Because the potential prejudicial effect so vastly outweighs any probative value, Fed. R. Evid. 403 provides an independent and adequate basis for excluding the admission of the proposed expert testimony challenged here.

## V.   RESERVATION OF ADDITIONAL ISSUES

As Mr. McClam continues to prepare for trial, the Defense will receive additional 3500 material.  The Defense's continued review of voluminous discovery may raise unforeseen trial issues. Accordingly, Mr. McClam respectfully reserves the right to supplement these motions *in limine*.

## VI.   CONCLUSION

For jurors to draw any inference that Mr. McClam had a particular motive,

28

opportunity, intent, preparation, plan, knowledge, identity, and/or absence of mistake or accident probative of the charges against him here based on evidence of his prior conviction and associated wiretap-related conduct requires "employing the very kind of reasoning—*i.e.*, once a drug dealer, always a drug dealer—which 404(b) excludes." *Robinson*, 2017 WL 4466616 at *4 (internal quotations and citation omitted). Evidence regarding either the alleged dog alert and trap compartment is likewise insufficiently probative of the charged conduct to overcome the prejudicial effects of admission.

For the foregoing reasons, Mr. McClam respectfully submits that Rule 404(b) and all four *Huddleston* factors require preclusion of the prior act evidence the Government seeks to admit. Mr. McClam also submits, as to the dog alert and the Government's proffered expert dog handler testimony, specifically, that Rules 702 and 403 further require preclusion.

Dated:        New York, New York
              September 8, 2020

                              Respectfully submitted,

                              /s/

                              MIEDEL & MYSLIWIEC LLP
                              80 Broad Street, Suite 1900
                              New York, New York 10004
                              Telephone: (212) 616-3046

                              Aaron Mysliwiec
                              *Counsel for Tony McClam*

                              THE LAW OFFICES OF CARINE M. WILLIAMS, PLLC
                              29 Broadway, Suite 1412
                              New York, New York 10006
                              Telephone: (212) 653-8321

                              Carine M. Williams
                              *Counsel for Tony McClam*

29