# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU: CRIMINAL TERM, PART 47
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                          NOTICE OF MOTION TO
                                          SET ASIDE VERDICT
           -against-                       PURSUANT TO CPL §330.30(1)

                                          Indictment No.: 43N-2018
TONY MCCLAM,                             (Hon. Howard Sturim)
                         Defendant.
------------------------------------------------------------------------x

        PLEASE TAKE NOTICE, that upon the annexed affirmation of Danielle Muscatello,

Esq., dated the 9th day of August 2019, the annexed memorandum of law, and upon all prior

proceedings that have been had in this matter to date, the Defendant, TONY MCCLAM, will

move this Court, Part 47 thereof, located at 262 Old Country Road, Mineola, New York 11501,

on the 23 day of September, 2019, at 9:30 a.m., or as soon thereafter as counsel may be heard,

for an Order setting aside the verdict pursuant to subdivision one of section 330.30 of the

Criminal Procedure Law.

Dated: August 9, 2019
        Garden City, New York 11530

                                   Respectfully submitted;

                                   Barket Epstein Kearon Aldea
                                 & LoTurco, LLP

                   By:  _____
                                   Danielle Muscatello
                                   Bruce Barket
                                   666 Old Country Road, Suite 700
                                   Garden City, New York 11530
                                   (516) 745-1500

To:  Clerk of the Court
     262 Old Country Road
     Mineola, New York 11501

     Madeline Singas
     262 Old Country Road
     Mineola, New York 11501

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU: CRIMINAL TERM, PART 47
-----------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

-against-

TONY MCCLAM,

                Defendant.
-----------------------------------------------------------------------x

AFFIRMATION IN SUPPORT
OF MOTION TO SET ASIDE
VERDICT PURSUANT TO CPL
§330.30(1)

Indictment No.: 43N-2018
(Hon. Howard Sturim)

I, DANIELLE MUSCATELLO, ESQ., an attorney duly admitted to practice law in the courts of this State, do hereby affirm under penalty of perjury that the following statements are true, except for those made upon information and belief, as specified, which I believe to be true:

1. I am an attorney at Barket Epstein Kearon Aldea & LoTurco, LLP, counsel to the Defendant, TONY MCCLAM, and I am fully familiar with the facts of the case and with the proceedings that have been had in this matter to date.

2. I make this Affirmation in support of an application for an Order setting aside the jury's verdict pursuant to subdivision one of section 330.30 of the Criminal Procedure Law ("CPL").

3. Specifically, the verdict must be set aside because the court erroneously permitted the People to use evidence obtained from a post-indictment wiretap on the Defendant's phone to impeach the testimony of defense witnesses without first evaluating the legality of the warrant, without providing notice of the intercepted communications to defense counsel, and without giving defense counsel any opportunity to be heard.

4. Moreover, even if the government's use of the undisclosed intercepted

2

communications was somehow permissible for limited impeachment purposes, permitting the People to also use the unnoticed recordings to introduce evidence of uncharged crimes against the Defendant—again, without giving defense counsel any opportunity to be heard—violated the defendant's due process right to a fair trial and constitutes grounds for reversal.

5. This Affirmation is based upon a review of the transcript of the trial that was conducted in this matter, upon various materials disclosed to the defense by the District Attorney's Office, and upon an independent review of relevant case law and statutory authorities.

6. No prior application has been made for the relief requested herein.

### ***Procedural Overview***

7. By indictment number 1697N-16, voted October 8, 2016, the defendant was charged with two counts of Criminal Possession of a Controlled Substance in the First Degree (PL §220.21[1]), two counts of Criminal Possession of a Controlled Substance in the Second Degree (PL §220.18[1]); six counts of Criminal Possession of a Controlled Substance in the Third Degree (PL §220.16[1], [12]), two counts of Criminal Possession of a Weapon in the Second Degree (PL §265.03[3]), three counts of Criminal Possession of a Weapon in the Third Degree (PL §265.02[1]), Criminal Possession of Marihuana in the Second Degree (PL §221.25), four counts of Criminal Possession of a Firearm (PL §265.01-b[1]), and two counts of Criminal Possession of a Weapon in the Fourth Degree (PL §265.01[1]).

8. Specifically, the People alleged that upon responding to a fire at apartment number 219, located at 725 Miller Avenue in Freeport (the "Wharfside Condominium"), and then subsequently executing a search warrant at the apartment, law enforcement officials recovered

three loaded firearms, approximately three pounds of marihuana, one kilogram of fentanyl, over two ounces of heroin (89.18 grams), one and a half kilograms of a combination of heroin and fentanyl, assorted paraphernalia for secreting, packaging, and weighing the drugs, and $446,282 in cash.

9.   The Defendant, who was initially present at the scene during the fire, but then left, was not immediately arrested.  Instead, he was placed under arrest on October 18, 2016, when he reported to his Nassau County Probation Officer.[1]

10. In July of 2018, in connection with a separate long-term drug trafficking investigation, the District Attorney sought and obtained from Judge Sullivan an eavesdropping warrant on the Defendant's phone.  Prosecutors, therefore, unbeknownst to the Defendant or defense counsel, were monitoring the Defendant's phone calls during the time leading up to the Defendant's trial, and they continued listening to his private conversations after the trial commenced.

### *Factual Background*

### *The Court Grants the People's Request to Present Evidence of the Defendant's Post-Offense New Jersey Crimes on Their Direct Case*

11. Prior to commencing jury selection on February 4, 2019, the People made an application pursuant to *People v. Molineux*[2] to present evidence, on their direct case, that after

---

[1]  Over one year later, on January 10, 2018, the People charged the Defendant with an additional count of Operating as a Major Trafficker (PL §220.77[3]) under indictment number 43N-2018, and then consolidated the first indictment into the second. By Decision dated October 17, 2018, however, Judge Corrigan dismissed the Major Trafficker charge on the ground that the "mere possession of a large quantity of drugs, drug paraphernalia and money is insufficient to support this charge."  In other words, the court stated, the evidence in the grand jury established no more than the existence of a stash house.

[2]  *See* 168 N.Y.264 (1901).

the fire at the Defendant's apartment, the Defendant fled to New Jersey, attempted to obtain a fake driver's license in the name of Ernest McClam, and on October 13, 2016, was placed under arrest after being found in possession of multiple forged documents. This 'other crime evidence,' the People argued, was relevant to establishing the Defendant's consciousness of guilt and to explaining the delay in his arrest. It was, the prosecutor argued, part of one continuous criminal event.[3]

12. Over defense counsel's objection, the court agreed that the conduct underlying the Defendant's criminal conviction in New Jersey appeared to be "a continuation of the narrative" of the Defendant's crimes in New York (Proceedings: 22), and ruled that the People would be permitted to "get into the fact that [the Defendant] applied for a license in a different name in New Jersey and what he had in his possession that underlies that" – in other words, "everything relevant to him trying to purport himself to be someone else" (Proceedings: 23).

13. Accordingly, at trial, in addition to presenting evidence that the Defendant committed the crimes charged in the indictment, the People also presented the testimony of a New Jersey police officer, who testified that on October 13, 2016, she arrested the Defendant after responding to a New Jersey DMV office and observing the Defendant to be in possession of a birth certificate in the name of Ernest McClam, a fraudulent New York State driver's license in the name of Ernest McClam, but bearing the Defendant's photograph, and an application for a New Jersey driver's license bearing the signature of Ernest McClam (Fontanella: 876-906).

---

[3] As a result of the Defendant's actions in New Jersey, the Defendant pled guilty on June 8, 2017 to forgery, possession of a false government issued identification, and knowingly exhibiting a false government-issued driver's license. The People therefore also sought, as part of their *Sandoval* application, permission to question him, in the event he elected to testify, about both the conviction and the facts underlying it. The court, however, ruled that if the Defendant took the stand, the People would only be permitted to ask whether he was convicted of a misdemeanor.

14. The People did not seek permission from the Court to present any other bad act or other crime evidence against the Defendant on their case-in-chief, nor did they seek to present any other such evidence against the Defendant for impeachment or rebuttal purposes.

### *The People Advise the Court, after Resting Their Case, that Prosecutors Have an Active Eavesdropping Warrant on the Defendant's Telephone and Have Intercepted Conversations Suggesting that the Defendant Intends to Present Perjured Testimony*

15. The People rested their case prior to the court's lunch break on February 25, 2019, approximately three weeks after the trial started.  Before the Court adjourned the matter to the afternoon session, however, and after counsel advised the court – pursuant to the court's inquiry – that the Defendant would likely be calling Samuel Gibson, Krystal Gittens, and Tywan Holder[4] as witnesses, and also – potentially – Christopher White, Richard Rizzo, Private Investigator Phil Tricola, and Mitch Green (Proceedings: 943-44), the following colloquy took place:

> **Prosecutor**: Your Honor, at this time, the District Attorney's Office would like to make an application *in camera*.
>
> **The Court**: With respect to what general area?
>
> **Prosecutor**: We actually are not aware of the general area.  However, my bureau chief is in the audience and would be able to advise you of the issue.
>
> **The Court**: Does it have to do with the subject matter, facts, and circumstances of what we're litigating here?
>
> **Prosecutor**: I don't believe it's with respect to the evidence that has been presented to the case, been presented at trial.
>
> **The Court**: Okay.  I will hear from them.  See you promptly at 2:00, please.
>
> **Defense Counsel**: Judge, is this *ex parte*?
>
> **The Court**: Yes.  They're asking for an *in camera ex parte*.

---

[4] Holder's first name was actually Tyrone, not Tywan.

**Defense Counsel**: Can I – to preserve the record, I want to know what the basis is so I can-

**The Court**: I don't know either. I'm going to hear them *in camera*. If it's something that you – that you're entitled to hear, I will certainly have you hear it.

(Proceedings: 944-45).

16. In chambers, Assistant District Attorney Edward Friedenthal, Bureau Chief of Special Operations, Narcotics and Gangs, along with Assistant District Attorneys Maureen McCormick, Daniel Bresnahan, and Michelle Burke, advised the Court that on July 10, 2018, the People began investigating another defendant, Daryl Boyd, that this investigation involved electronic eavesdropping, and that on July 20, 2018, based on information intercepted over the Boyd wire, the People had sought and obtained an eavesdropping warrant for the Defendant's phone as well.[5]

17. The prosecutors then informed the Court that in connection with this 'other' investigation, the People had also intercepted conversations over the wire which lead them to believe that the Defendant intended to call witnesses at the trial who would perjure themselves, and they asked the Court to assign attorneys to the witnesses to advise them of the ramifications of committing perjury (2/25/19 Ex Parte App.: 3-4). Specifically, the prosecutor expressed concern that the Defendant was enlisting others to forge a notary stamp on a document which the Defendant intended to present at trial (2/25/19 Ex Parte App.: 7-8), and with the transcripts of the subject conversations in hand, the prosecutor read the Court portions of the relevant recorded

---

[5] The People indicated that they wanted to "maintain the secrecy of the wiretap" (2/25/19 Ex Parte App.: 19), but that they had sought and obtained sharing orders permitting them to inform the court and Judge Corrigan about what was taking place (2/25/19 Ex Parte App.: 19).

communications (2/25/19 Ex Parte App.: 4).[6]

18. ADA Friedenthal also told the Court, however, that in order to "preserve the integrity of the courtroom proceedings," the prosecutors who were actually conducting the Defendant's trial had not been informed of the eavesdropping warrant on the Defendant's phone, or of the substance of any intercepted conversations.  In fact, ADA Friedenthal stated, "*no matter what happens here, this information is not going to be used by them in cross-examination*" (2/25/19 Ex Parte App.: 3).[7]  Rather, he asserted, the People's goal in bringing the wire to the Court's attention was "to make sure that the truth gets out to these jurors and to prevent crimes from taking place if we can" (2/25/19 Ex Parte App.: 18).

19. Finally, based on the fact that the Defendant had apparently been overheard enlisting the help of others to present false evidence at trial, and given the additional concerns expressed by prosecutors that the Defendant had also tried to intimidate one of the trial assistants by 'waiving' at her on social media, and had been overheard on the wire inquiring about a sworn juror, the prosecutor asked the Court to remand the Defendant (2/25/19 Ex Parte App.: 10-12; 17).

20. When the Court re-called the case on the record, the Court stated, "[o]ff the record but in a sealed record, we had an *ex parte* conversation, we have created a record that's going to

---

[6]   During this *ex parte* conversation with the Court, ADA Bresnahan assured the Court that there were no minimization issues and stressed that the calls pertaining to the suspected perjury were properly intercepted pursuant to section 700.65(3) of the CPL, the "plain view" provision of the statute, which permits the interception of calls that evince the commission of unanticipated crimes – not otherwise described in the eavesdropping warrant – which are inadvertently discovered during the lawful execution of the eavesdropping warrant (2/25/19 Ex Parte App: 25-27).

[7]   Later, the prosecutor clarified, "when I said the assistants were not aware of the wire, they were aware that there was a wire going on. Once the trial started, they were in fact walled off from any further communications" (2/25/19 Ex Parte App.: 23).

be sealed and made part of this file" (Proceedings: 945-46).[8] After indicating that the Court

wanted to speak to one of the jurors, the court then stated:

> In addition, I believe it's appropriate to have an attorney outside to speak to each
> of the witnesses and just to make them aware of the problems attendant to telling
> less than the truth on the stand. Prior to bringing in those witnesses, we are going
> to hear from the attorney in case any of them decide to take the Fifth. But other
> than that, we are going to proceed as usual.

(Proceedings: 946).[9]

19.   Defense counsel asked whether the Court could disclose what had taken place in

chambers, but the court answered, "No. No, I can't. Just to say that concerns have been raised.

That's all. And it's my understanding, as well, that the trial assistants don't know the contents of

that discussion either" (Proceedings: 946).

### The Defendant Presents the Testimony of Three Witnesses, and the Court
### Revokes His Bail and Remands Him to Custody; Meanwhile, the Government Prepares to
### Execute a Search Warrant on the Defendant's Family Home

20.   In an effort to distance the Defendant from the contraband recovered from the

apartment at 725 Miller Avenue, and demonstrate that a subtenant had actually been residing at

the premises at the time of the fire, defense counsel called Samuel Gibson, Crystal Gittens, and

Tyrone Holder.

21.   Gibson testified, in substance, that he was an electrician and a notary public, and that

on January 2, 2015, at a library in Freeport, he notarized a residential lease agreement between

---

[8] Contrary to the Court's assertion, portions of the *ex parte* conversation remain insulated from appellate review as the court, at one point, granted ADA McCormack's request to "go off the record a moment" (2/25/19 Ex Parte App.: 23), and then later also directed, *sua sponte*, that an additional portion of the *ex parte* conversation be held off the record (2/25/19 Ex Parte App.: 25).

[9] Prior to going back on the record, the Court indicated that assigning attorneys to the Defendant's witnesses would not be problematic, but expressed concern about remanding the Defendant without placing the Court's reasons for doing so on the record and without disclosing those reasons to defense counsel (2/25/19 Ex Parte App.: 20-21; 24).

the Defendant and a Spanish man named, "Danny" (Gibson: 948-51; 963).[10]

22. Gibson denied receiving compensation for his testimony (Gibson: 968-69); he denied being in communication with the Defendant since notarizing the lease agreement in 2015 (Gibson: 970); and he denied that the document purporting to be the notarized lease agreement had actually just been created for the trial (Gibson: 970-71).

23. Crystal Gittens testified that she worked as a house cleaner (Gittens: 976), and that one time per month up until January of 2015, she cleaned the Defendant's apartment at 725 Miller Avenue (Gittens: 977). After January of 2015, however, Gittens stated that the Defendant moved out of the apartment. She explained that she continued to clean the premises for a little over one year for a Spanish guy named Danny (Gittens: 977-78), but that the apartment, which had been relatively neat when maintained by the Defendant, ultimately became "like a party house," and was too much work to clean. So, in April of 2016, Gittens explained, she quit (Gittens: 978-79).

24. Gittens denied having a personal relationship with the Defendant, admitting only that she had been acquainted with him for a number of years through the Roosevelt neighborhood (Gittens: 981); she maintained that defense counsel—not the Defendant—had contacted her about testifying at the trial (Gittens: 983); and she denied that anyone was paying her for her testimony or had made any promises to her (Gittens: 1016).

25. Tyrone Holder testified that he worked as a security guard at the Wharfside condominium for about two and a half years, up until around October of 2015, and, like Gittens, he, too, claimed that the Defendant had moved out of the apartment in January of 2015, prior to

---

[10]   Before Gibson took the witness stand, the Court advised that an attorney was outside the courtroom and was going to call Gibson's name and speak to him (Proceedings: 946).

the fire, and rented the apartment to a Spanish guy named Danny (Holder: 1030-31).[11]  Holder

stated that after the Defendant moved out, he observed a lot of people coming in and out of the

apartment (Holder: 1032), and he stated that he saw the Defendant return to the apartment a few

times per month with a pickup truck to pick up supplies from the garage (Holder: 1036).

26. At the conclusion of Holder's direct examination, and after a brief off-the-record

conference at the bench, the Court dismissed Holder from the witness stand and directed him to

return to court in the morning. Next, without having entertained any on-the-record application by

the People, and without—upon information and belief—giving any notice to defense counsel, the

Court remanded the Defendant, stating:

> Based upon information learned in *camera ex parte*, which will be sealed and
> made part of the record, as well as the testimony involved in this case and
> including but not limited to the defendant's attempts to avoid prosecution by
> fleeing to New Jersey, coupled with the fact there's a significant risk of
> substantial jail time in this case, and I having heard the evidence involved in this
> case, I'm going to make a change in the bail status.   The defendant is now
> remanded.  Bail is exonerated.

(Proceedings: 1038-39).[12]  The Defendant asked the Court what he was being charged with, and

the Court responded, "You're not charged.   You're just being remanded until the end of the trial"

(Proceedings: 1039).  The Court then directed the parties to appear at 9:30 a.m. the next morning.

---

[11]  On cross-examination, when confronted with the dates of his employment, Holder acknowledged that he had
actually worked at the condominium for only one year (Holder: 1050).

[12]  Holder actually had four open criminal cases in Nassau County at the time of his testimony, and in three of the
cases, he had already pled guilty (Proceedings: 1045-46).  Further, in connection with his plea agreement, Holder
was participating in an 18-month drug rehabilitation program (Holder: 1113). Given these facts, apparently
unknown to the parties at the time Holder first took the stand, the court granted the People's request to contact
Holder's attorney, with whom Holder conferred prior to his cross-examination (Proceedings: 1047-48).
Subsequently, on cross-examination, Holder admitted that he knew the Defendant from the fish and chips restaurant,
which the Defendant owned, and that the two would say hello and have conversations with each another.  He denied,
however, that the Defendant was his friend.  Instead, Holder explained, the Defendant asked him to testify about
observing the U-haul truck at the Defendant's apartment after the two ran into each other at a gas station in
Hempstead (Holder: 1058-61; 1101).  Holder denied knowing anything about the fire in the Defendant's apartment,
and he denied the prosecutor's suggestion that he was paid for his testimony (Holder: 1101-03).

11

*During the Overnight Recess, the People Terminate the Wiretap on the Defendant's Phone,
and the Court Grants the People's Second Ex Parte Application to Use the Unsealed
Intercepted Conversations on Cross-Examination and Rebuttal*

27. When proceedings resumed – the day after the Court remanded the Defendant – the

Court granted ADA Friedenthal's request to make a second *in camera ex parte* application to the

Court (Proceedings: 1047).

28. In chambers, ADA Friedenthal advised the Court that he had spoken to Judge

Sullivan – the judge supervising the wiretap regarding Boyd, the Defendant, and others – that the

investigation had been terminated "with certain events that are not related to th[e] trial" (2/26/19

Ex Parte App: 2),[13] and that Judge Sullivan had unsealed the recordings.   Accordingly, the

prosecutor stated, the People were seeking permission to advise the trial assistants of the

incriminating intercepted communications so that the assistants could use them on rebuttal and

on cross-examination.   Furthermore, the prosecutor advised the Court that authorities had

actually arrested Samuel Gibson for perjury based on recorded statements he made over the wire

which contradicted his trial testimony, and the People were therefore also seeking permission to

recall Gibson so that prosecutors could confront him, too, with certain recorded conversations

(2/26/19 Ex Parte App.: 2-5).[14]

---

[13]   In fact, the government had executed a search warrant on 12 Anna Avenue in Roosevelt, the home where,
according to the defense, the Defendant had relocated when he moved out of his apartment at 725 Miller Avenue.
The search warrant was signed by Judge Sullivan on *February 25, 2019 at 11:35 a.m.*, and it is unclear whether the
People disclosed this fact to the Court during their first ex parte communication or at some point thereafter.

[14]   In support of their application, prosecutors maintained that even though there was no notice of the intercepted
communications pursuant to section 700.70 of the CPL, and even if the wiretap was totally illegal, the People were
nevertheless permitted to use the intercepted conversations to cross-examine witnesses (2/26/19 Ex Parte App.: 4).
ADA McCormack stated that she would send the court some of the case law the People had located regarding the
propriety of using communications intercepted over the wire for impeachment purposes (2/26/19 Ex Parte App: 8-
9), and cited to the Second Department's decision in *People v. Brooks* 56 A.D.2d 634 (2d Dept. 1977).

29. Without conducting a hearing—or making any substantive inquiry regarding the constitutional and statutory propriety of the wiretap *at all*—the Court granted the People's application, ruled that prosecutors could disclose the intercepted communications to the trial assistants, and stated that the Court would rule on the propriety of cross-examination "as it comes" (2/26/19 Ex Parte App: 6).

30. The Court did not direct the People to give defense counsel notice of the Court's ruling, or to provide him with the recordings or transcripts of any of the intercepted communications.

### *Using the Unnoticed Intercepted Communications, the Prosecutor Elicits from a Defense Witness Evidence that Defendant Committed Other Uncharged Crimes: Namely, That Defendant Sells Drugs and Guns*

31. The defense's fourth witness, Mitchell Green, an admitted user of marihuana and cocaine, testified that he purchased cocaine on occasion at 725 Miller Avenue, but that he did so from men named Juan and Danny, and not from the Defendant (Green: 1118-20; 1131).

32. When Green was asked if he knew the Defendant, he testified that he had seen him "from the hoods" for years and knew him as Black (Green: 1133-34), but had not spoken to him prior to the trial (Green: 1127), and he also denied that he considered the Defendant to be a friend (Green: 1139). In fact, Green claimed, he thought Danny was the subject of the trial, and not the Defendant (Green: 1127).

33. During a break in Green's cross-examination, the prosecutor asked that an attorney be assigned to speak to Green about the ramifications of perjuring himself (Green: 1141), and for the first time, the prosecutor stated: "We do have information based upon the electronic eavesdropping warrant that this witness has repeatedly perjured himself on direct examination.

Instead of just arrest him at this time, we do want to give him an opportunity to speak to an attorney and perhaps correct that behavior" (Proceedings: 1141).   Accordingly, the court appointed attorney Steven Raiser to represent Green, and a brief recess was taken (Proceedings: 1141).

34. When the trial resumed, the prosecutor informed the Court that pursuant to Mr. Raiser's request, the People would agree not to prosecute Green for the prior untruthful statements that he made under oath so long as he agreed to testify truthfully going forward (Proceedings: 1142).   Green then re-took the witness stand and admitted, contrary to his earlier testimony, that he did know the Defendant, that he called the Defendant Cuzzo, and that he had actually known the Defendant for his entire life (Green: 1144-46).   Green also admitted that he lied when he stated that he had no idea that he had been asked to testify at the Defendant's trial, acknowledging that he had spoken to the Defendant on the phone prior to his testimony (Green: 1147-48).

35. Next, the prosecutor asked Green how often he spoke to the Defendant, and Green answered, "Not on a regular" (Green: 1149).   The prosecutor then asked, "Isn't it true over the past few months you've spoke to him hundreds of times?" and when Green denied this, and estimated that since July, he had only spoken to the Defendant five or ten times (Green: 1149-50), the prosecutor commenced the following exchange:

> **Prosecutor**: And isn't it true that in those phone calls, you speak to this defendant about *purchasing drugs from him*?"
>
> **Green**: No.
>
> **Prosecutor**: Never?

**Green**: Never.  I would put my life on that.

**Prosecutor**: Just recently, on October 3, 2018, at 1:48 p.m. in the afternoon, you received a call from this defendant, Tony McClam, and isn't it true that *you told him you were looking for an ounce, and he told you it would be $150*, and you told him you would call when you're on your way around?

**Green**: An ounce?

**Prosecutor**: An ounce.

**Green**: $150?

**Prosecutor**: Yes

**Green**: Marijuana.

**Prosecutor**: You tell me what drug you were asking for.

**Green**: If I get something an ounce for $150, that's marijuana.  That ain't no – you. Can't get no ounce of cocaine for $150 or anything else.

**Prosecutor**:  So, it was marijuana for $150?

**Green**: That's if you're saying. I don't know about buying any dam –

**Court**: That's not the question.

**Green**: I don't remember no conversation about –

**Court**: You don't remember that conversation?

**Green**: No, I don't remember that.

**Prosecutor**: Would it refresh your recollection to see the transcript of that conversation with your phone number on it?

**Green**: Even show me that, that don't mean it was me on there.  I don't know no ounce of no Goddamn –

**Prosecutor**: *So you never asked this defendant, Tony McClam, in October 2018 that you were looking for an ounce*?

15

**Green**: I told – I don't know – I don't – I can't recall that.  I can't recollect that.

**Prosecutor**: So it's changed. It's not you will swear your life on it never happened. Now it's you can't recall?

**Green**: I don't recall – I'm trying to explain to you, baby. It's not –

**Prosecutor**: Yes or no?

**Green**: That's what I just told you.  I don't recollect me asking nobody on no phone for no ounce.

**Prosecutor**: But you're not swearing your life on it anymore?

**Green**: Right.

**Prosecutor**: It is possible that you made that phone call?

**Green**: Or somebody had my phone.  I don't know what they have.

**Prosecutor**: Somebody using your phone number?

**Green**: I could pass my phone. I hang in parks and everything. I told you maybe somebody use my phone.

**Prosecutor**: ***So you pass your phone around and other people use your phone to order drugs from this defendant?***

**Green**: I don't know that they was calling him for it. That's why I just swore on my life I never called him for no drugs. Never.

**Prosecutor**: Don't recall or swear on your life?

**Green**: That's what I'm telling you.  I don't recall.  You only got that one thing? Got that one right there –

(Green: 1150-1153).

**Prosecutor**: Mr. Mitchell, you have said you have known this defendant, your Cuzzo, your whole life, yes?

**Green**: Yeah.

**Prosecutor**: It's true, right?

**Green**: Yes. I said yes at the same time I said it.

**Prosecutor**: *And you certainly know him to be a drug dealer?*

**Green**: No. No. He is not labeled as a –

**Prosecutor**: Well, *you know him to sell drugs?*

**Green**: No, I don't know him to sell drugs.

**Prosecutor**: *Never bought any drugs from him?*

**Green**: No.

(Green: 1153).

36. Briefly, the court interrupted the prosecutor's cross-examination, suggested that the prosecutor show Mr. Raiser the transcripts of the calls to which she was repeatedly referring, and reminded Green of the importance of giving truthful testimony (Green: 1154-55). Without also showing the transcripts to defense counsel—and having received no directive to do so—the prosecutor then resumed her cross-examination.

**Prosecutor**: Mr. Green, I want to go back to where we left off in the conversation of October 3, 2018. On that date, *you called this defendant, Tony McClam, to ask him for drugs, isn't that right?*

**Green**: Marijuana.

**Prosecutor**: Marijuana. *So you on that date called this defendant asking for marijuana?*

**Green**: Yes.

**Prosecutor**: *And you called him numerous times asking for marijuana and other drugs?*

**Green**: Not other drugs. Marijuana.

17

**Prosecutor**: *So you repeatedly buy marijuana from this defendant, Tony McClam*?

**Green**: I don't know if it comes from him. You know?

(Green: 1156-57).

37. Upon continued questioning, when Green claimed that he never actually got marijuana from the Defendant but just repeatedly asked for it, the prosecutor stated, "***Isn't it true that you don't only ask this defendant for drugs, but you also ask him for guns***? Green responded, "Guns?" the prosecutor said, "Yes;" and Green stated, "I don't recall that one" (Green: 1158).

> **Prosecutor**: *Well, to refresh your recollection, on November 12, 2018, just a few months ago, at about 1:42 in the afternoon, this defendant called you and you told him you wanted a strap or a jack, which refers to a gun, isn't that right*?
>
> **Green**: That's different. No. That's different. It's different variations for a gun. It's just – no. I mean, strap does fall under that, but no.

(Green: 1159).

38. Green tried to explain that a "jack" can be a phone or a $20 bag of weed, and then, as it was clear to Green that the prosecutor was reading from something, he asked the prosecutor to show to him the material or item to which she was referring (Green: 1159). The prosecutor then turned to the court for guidance:

> **Prosecutor**: I have an electronic copy of this. I don't have a print of this one.
>
> **Court**: Either you're going to show him to refresh his recollection or not.
>
> **Prosecutor**: Can I show it to him on a device?
>
> **Court**: Yes. This is unusual. Show it to Mr. DerGarbedian before you show it to me.
>
> **Defense Counsel**: I don't have any idea what that is, Judge, and it can't be credited.

18

**Court**: Well, we're going to take a copy of that, and you can use it to refresh his recollection, but then you'll give it to the officer to make a copy of it.

(Proceedings: 1159-60).

39. The court then told the prosecutor to "Go right ahead," whereupon Green stated, "I can't see it. I don't understand," and instead of continuing, the prosecutor indicated that she would simply move on (Green: 1160).

40. The prosecutor's very next question was: "***Mr. Green, you don't only call this defendant regarding drugs or guns, but he does other things for you; isn't that right***?" and she then proceeded to elicit the fact that the Defendant helped to provide Green with the car that he drives and paid for him to stay in a hotel during his testimony at the trial (Green: 1160-62).

41. Ultimately, Green admitted that he was lying when he testified that he did not know the Defendant, and when he claimed that he never got marijuana from the Defendant (Green: 1163-64; 1167), but he maintained that Juan was the person from Wharfside who sold him drugs – not the Defendant (Green: 1164; 66).

42. Still, the prosecutor mocked the notion that the only lie Green told during his testimony was regarding the length of time that he knew the Defendant, and asked Green again whether it was true that he "***repeatedly asked the defendant for drugs because [the defendant] deals [Green] drugs?***" (Green: 1166).

### The Court Permits the Prosecutor to Question a Defense Witness about the Search Warrant that Was Executed the Previous Night at the Home Where the Defendant Claimed to Reside and Whether a Large Quantity of Drugs Was Recovered

43. The defense's final witness, Christopher White, testified that he lived in a rented five-bedroom house at 12 Anna Avenue in Roosevelt with his brother, and with the Defendant, the

Defendant's mother, Ida May, and the Defendant's bother, William (aka Love) (White: 1172-73; 1184).   The Defendant, he testified, moved into the basement of the home in January 2015 (White: 1173).

44. According to White, on January 12, 2015, he and the Defendant rented a U-Haul from Rockville Centre so that White could help the Defendant move.  White testified that he followed the Defendant to an apartment on Miller Avenue in Freeport (White: 1174), where he helped him load items from an apartment garage into the U-Haul (White: 1176-77), but left behind the Defendant's restaurant equipment (White: 1189), and he also stated that this was the first and only time that he had ever been to the apartment.  White testified that he did not actually go inside, he estimated they were there for just over a half hour (White: 1177-78) or maybe even forty to forty-five minutes (White: 1187), and afterwards, he stated, they unloaded the U-Haul back at 12 Anna Avenue (White: 1178).

45. On cross-examination, the prosecutor elicited the fact that White and the Defendant grew up together, that the Defendant's family had provided White with a place to live (White: 1181-83), and that White did not actually recall whether he had seen the Defendant at the house on 12 Anna Avenue on September 24, 2016, the date of the fire (White: 1191).

46. On re-direct examination, defense counsel then asked White: "During the course of the entire time you lived with [the Defendant], did you ever see suspicious people come to the house you live at and him sell drugs? (White: 1193).  The Court overruled the prosecutor's objection, and permitted the witness to answer that he never had.  The prosecutor then asked to approach, and after a brief off-the-record discussion at the bench, asked White: "***Were you aware that a search warrant was executed at 12 Anna yesterday?***"  White answered, "Yes, ma'am,"

and the prosecutor then asked, "*And a large quantity of drugs were recovered from that location?*" (White: 1194) (sic).  White stated that he had "no idea about that" (White: 1194).

47. At the conclusion of White's testimony, defense counsel first protested the fact that the prosecutor asked witnesses, repeatedly, whether the Defendant sold drugs, improperly suggesting to the jury that these individuals had actually witnessed the Defendant conduct hand to hand transactions; and second, he reminded the court that the Defendant had not yet been charged with the drugs recovered pursuant to the execution of the warrant, and argued: "To permit the District Attorney to execute a search warrant during the middle of trial and to find drugs and then to ask a witness, ask a witness are you aware of the fact that drugs were found in that house is highly prejudicial to the jury and has nothing to with this case" (Proceedings: 1196).

48. The Court noted counsel's objections, but maintained that defense counsel had opened the door to the testimony about the warrant by asking whether or not White had ever seen the Defendant selling drugs out of the location (Proceedings: 1196-97).

### *The Court Grants the People's Request to Recall a Defense Witness and Present Evidence to the Jury that the Witness Had Been Arrested for Perjury after His Testimony and Had Lied to the Jury in Exchange for Payment from the Defendant*

49. Before the defense rested its case, the prosecutor asked that Samuel Gibson, who the People had arrested and arraigned on perjury charges at the conclusion of his testimony on February 25, 2019, be re-called so that the People could confront Gibson with certain communications they had intercepted on the wire.  The Court assigned attorney Anthony Grandinette to represent Gibson (Proceedings: 1167-68; 1199), and after being given a brief opportunity for consultation client, Mr. Grandinette informed the Court that given the time

21

constraints, counsel had no choice but to advise Gibson to invoke his Fifth Amendment right to remain silent in response to each and every question asked of him.  Further, Mr. Grandinette argued, the law, under the circumstances, did not permit Gibson to be re-called by either party given his intent to invoke his right to remain silent (Proceedings: 1168-70; 1199-1200).

50. In response, the Court asked the People if they had an application, and the prosecutor stated, "If that's the case, we would ask you Honor to strike his entire testimony and advise the jury that it is so stricken and to disregard it completely (Proceedings: 1200).  When counsel indicated that he needed time to research the issue, the Court agreed to adjourn the matter until the next day but to make sure that Gibson was produced for court.

51. The next morning, the Court stated, "I understand there's an application?" (Proceedings: 1203), and the prosecutor indicated that it was the People's intention to re-call Gibson, and elicit the fact that after Gibson testified, he was arrested for perjury, and that in exchange for his truthful testimony, he would be pleading guilty to a misdemeanor and receiving a non-jail sentence (Proceedings: 1203).

52. The Court indicated that it was going to allow the People to "do what they[ ] requested" and bring out "the fact that there was a charge and a deal."  The Court then told counsel that he was "welcome to inquire about that as well" (Proceedings: 1204).

53. Gibson, who was in custody, was then put back in the witness stand for "continued cross examination," at which time he admitted, in the presence of counsel, that the Defendant paid him to lie (Gibson: 1223).  Gibson testified that he lied to the jury when he testified that he met the Defendant in January 2015; that he lied when he testified that he had notarized a lease for the Defendant at that time, and that contrary to his earlier testimony, he had actually met the

Defendant the same month of his testimony (Gibson: 1206-07). Gibson further admitted that he never met anyone named Danny Loaza (Proceedings: 1208); he stated that in exchange for a $1,000 cash payment from the Defendant, he simply backdated his notary stamp pursuant to the Defendant's request to make his notarization of the Defendant's signature and the signature of someone named Danny look legitimate (Proceedings: 1209-11); and he testified that the Defendant agreed to pay him another $1,000 in cash in exchange for his testimony (Proceedings: 1211-12).

54. Finally, the prosecutor elicited from Gibson that at the conclusion of his initial testimony, he was placed under arrest for perjury and given an opportunity to listen to a recorded phone call between himself and the Defendant, which took place on February 13, 2019 at 1:05 p.m. Subsequently, Gibson pled guilty to committing perjury in exchange for the promise that if he testified truthfully, he would not be sentenced to any time in jail (Proceedings: 1212-15).

55. By a verdict reached on March 5, 2019, the jury convicted the Defendant of all 15 counts of the indictment.

WHEREFORE, given these record facts, together with the reasons set forth in the annexed memorandum of law, the Defendant moves this Court for an Order setting aside the verdict pursuant to subdivision one of section 330.30 of the CPL.

Dated:  August 9, 2019
        Garden City, NY 11530

                                        Respectfully submitted;

                                        *Danielle Muscatello*

                          By:  _____
                                        Danielle Muscatello

23

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU: CRIMINAL TERM, PART 47
------------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                        MEMORANDUM OF LAW IN
                                        SUPPORT OF MOTION TO SET
                                        ASIDE VERDICT PURSUANT TO
            -against-                          CPL §330.30(1)

                                          Indictment No.: 43N-2018
TONY MCCLAM,                             (Hon. Howard Sturim)
                        Defendant.
------------------------------------------------------------------------x

<u>**MEMORANDUM OF LAW**</u>

**POINT ONE**

**THE COURT ERRED BY PERMITTING THE PEOPLE TO USE EVIDENCE OBTAINED FROM A POST-INDICTMENT WIRETAP ON THE DEFENDANT'S PHONE TO IMPEACH DEFENSE WITNESSES WITHOUT FIRST EVALUATING THE LEGALITY OF THE WARRANT, AND WITHOUT PROVIDING NOTICE OF THE INTERCEPTED COMMUNICATIONS TO DEFENSE COUNSEL OR GIVING COUNSEL AN OPPORTUNITY TO BE HEARD. U.S. CONST. AMEND IV; N.Y. CONST. ART. I, § 6.**

It is fundamental that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). At the same time, however, the Supreme Court has carved out an exception to the exclusionary rule, which permits prosecutors to introduce illegally obtained evidence against a defendant at trial for the limited purpose of impeaching the credibility of *the defendant's own testimony. See Harris v. New York*, 401 U.S. 222, 224–226 (1971) (prosecutors may impeach a defendant's credibility with incriminating yet voluntary and reliable statements elicited from the defendant in violation of *Miranda* requirements); *Walder v. United States*, 347 U.S. 62, 65–66 (1954) (permitting prosecutors to introduce evidence of heroin obtained through an illegal search

to undermine the credibility of the defendant's claim that he never possessed narcotics). *See also United States v. Caron*, 474 F.2d 506 (5th Cir. 1973); *People v. Dash*, 126 A.D.2d 737 (2d Dept. 1987); *People v. Donnelly*, 103 A.D.2d 941 (3d Dept. 1984); *People v. Brooks*, 56 A.D.2d 634 (2d Dept. 1977). This impeachment exception to the exclusionary rule, the Supreme Court has reasoned, "further[s] the goal of truth-seeking by preventing defendants from perverting the exclusionary rule into a license to use perjury by way of a defense." *See James v. Illinois*, 493 U.S. 307, 313, *quoting United States v. Havens*, 446 U.S. 620, 626 (1980).

The exception is, however, very limited, and it only applies when the illegally obtained evidence (1) is offered in response to the defendant's own testimony on direct examination or in response to questions put to him on cross-examination that are plainly within the scope of his direct examination, (2) squarely contradicts the defendant's testimony, and (3) is offered for impeachment purposes and not as proof of the defendant's guilt. *People v. Mullins*, 179 A.D.2d 48 (3d Dept. 1992) (internal citations and quotations omitted). *See also United States v. Simels*, (the exclusionary rule does not prevent the government from using suppressed wiretap evidence obtained in violation of 18 U.S.C. §2515 to impeach the contradictory direct *testimony of the defendant*). After all, while defendants should not be permitted to use the exclusion of illegally obtained evidence as a shield for perjury, "it seems no more appropriate for the State to brandish such device as a sword with which to dissuade defendants from presenting a meaningful defense though other witnesses." *James*, at 317 (stating "[t]he truth-seeking rationale supporting the impeachment of defendants *does not* apply with equal force to other witnesses").

Accordingly, in 1990, in *James v. Illinois,* the Supreme Court made clear that the impeachment exception to exclusionary rule created by the Court in *Walder* and *Harris* would

25

not be expanded to permit the prosecution to impeach the testimony of all defense witnesses with illegally obtained evidence.  In *James*, eight boys were returning home from a party when they were confronted by three other boys who demanded money from them. When the boys refused, one of the three boys fired a gun at the larger group, killed one boy, and seriously injured another.  The police responded and collected eyewitness accounts of the event and descriptions of the perpetrators, and the next evening, two detectives took the defendant into custody after locating him at his mother's beauty parlor sitting under a hair dryer. The defendant's hair was black and curly, but the detectives questioned the defendant about his hair color, and he admitted that the previous day his hair had been reddish brown, long, and combed straight back, and that he had gone to the beauty parlor to dye and curl his hair and change his appearance. Nevertheless, prior to trial, the defendant's statements were suppressed on the ground that detectives arrested him without probable cause.

During the trial, each of the boys who had been part of the larger group and witnessed the shooting testified that the shooter had "reddish," shoulder-length hair in a slicked-back "butter" style, and each recalled having seen the defendant with that hair description several weeks earlier at a parade.  The defendant, whose hair was black at trial and worn in a "natural" style, did not testify in his own defense.  Instead, he called a friend of his family, who testified that on the day of the shooting, the defendant's hair was black, and the trial court thereafter granted the People's application to introduce the defendant's illegally obtained statements as a means of impeaching the witness's credibility.

The jury convicted the defendant for the shooting, but the Supreme Court reversed and held that "[e]xpanding the class of impeachable witnesses from the defendant alone to all defense

witnesses would create different incentives affecting the behavior of both defendants and law enforcement officers." *James*, at 313. The impeachment exception, the *James* court explained, penalizes defendants for committing perjury by allowing the prosecution to expose their perjury through impeachment using illegally obtained evidence; in other words, it discourages perjured testimony without discouraging truthful testimony. By contrast, expanding the impeachment exception to encompass the testimony of defense witnesses, might impermissibly chill some defendants from presenting their best defense – or perhaps any defense at all – through the testimony of others, and force defendants to make a pre-trial assessment of the likelihood that the court would permit the government to use the illegally obtained evidence to impeach the otherwise favorable testimony of the defendant's witnesses. *James*, 314-15. That is to say, expanding the exception "could impede the presentation of the defense case because the defense might not call some witnesses who purposely or inadvertently could open the door to the introduction of evidence of statements illegally obtained from the defendant." *Edwards v. Baughman*, 2019 WL 1369931 (N.D. Cal. 2019) (discussing *James*).

Here, of course, there was no judicial determination that the wiretap that prosecutors obtained on the Defendant's phone violated constitutional or statutory requirements, and the legal analysis used by the Supreme Court in *James* is therefore not directly on point. Here, instead, prosecutors simply assured the Court—in an *ex parte* conversation—that all minimization requirements had been met, and that the calls pertaining to the Defendant's suspected efforts to suborn perjury had been properly intercepted pursuant to section 700.65(3) of the CPL (2/25/19 Ex Parte App: 25-27).[15] Further, the People cited to the Second

---

[15] It appears the prosecutor meant to direct the court to CPL §700.65(4).

Department's decision in *People v. Brooks*, *supra*, where the appellate division, relying on the impeachment exception carved out by *Walder* and *Harris*, *supra*, reversed the defendants' convictions for "failure of proof," noted, in *dicta*, that it had not considered the validity of certain wiretaps and "bug authorization orders" in the case, because the investigation resulting in the indictment for which the defendant stood trial was not related to or dependent upon information gleaned from the intercepted communications, and stated that even had the court evaluated the wiretap's validity and determined that it was illegal, the intercepted conversations might still have been used to impeach the defendant's credibility on cross-examination. *Brooks*, 56 A.D.2d at 634. Reliance on *Brooks* is misplaced for several reasons and does not, therefore, provide cover for the conduct that the Court authorized in this trial.

First, prosecutors in *Brooks* appeared to have used the wiretap evidence to impeach the defendant's own testimony – not the testimony of any defense witness, as was the case here. Second, *Brooks* was decided in 1977, and it therefore pre-dates the Supreme Court's decision in *James*, which rejected the expansion of the impeachment exception in this context beyond the defendant's own testimony. Third, *Brooks* is silent on the issue of whether the court would have also concluded that it was permissible for the government to use the intercepted communications as a means of introducing evidence that the defendant had committed additional uncharged crimes. Fourth, there is no discussion in *Brooks* whatsoever about whether the defendant's attorney was given notice of the wiretap or the relevant intercepted communications, whether the subject wiretap had been terminated prior to the commencement of the defendant's trial, or whether the government in *Brooks* began listening to the Defendant's telephone calls after the defendant had been indicted and his right to counsel had attached.

28

Nor, in this instance, can the Fifth Circuit's decision in *United States v. Caron*, 474 F.2d

506 (5th Cir. 1973), which also pre-dates *James* and was cited by the Second Department in

*Brooks*, justify the government's court-sanctioned conduct in this case.  In *Caron*, the Fifth

Circuit held, in express reliance on the Supreme Court's decision in *Walder*, *supra*, that the

government was permitted, *over defense counsel's objection*, to use evidence procured by means

of a wiretap to impeach the defendant's testimony without any prior determination by the trial

court that the wiretap was lawful.[16]  In *Caron*, the defendant was charged with perjury based on

the prosecution's belief that he testified falsely before a grand jury by denying that he had ever

done any bookmaking or that he knew a specific bookmaker named Howard Gardner.  At trial,

after the prosecution rested its case-in-chief, the defendant took the stand as the sole witness in

his defense, denied being a bookmaker, admitted to knowing Howard Gardner, and testified that

if he had denied knowing Gardner in the grand jury, he must have been mistaken.  Then, on

cross-examination, the defendant continued to deny that he was engaged in bookmaking, but

admitted that he knew another bookmaker by the name of Louis Figueredo, on whose phone the

prosecutor had secured a wiretap.  Accordingly, armed with the recorded conversations, the

prosecutor asked the defendant whether he had specific conversations with Figueredo on various

specific dates, and when the defendant either denied the conversations or claimed that he was

unable to recall them, the prosecutor sought to introduce the recordings of the intercepted

conversations into evidence.  Without determining the validity of the wiretaps, the court granted

the government's application, *over the defendant's objection*, and permitted prosecutors to play

---

[16] Upon conversations with ADA Friedenthal, *Caron* is a case which prosecutors forwarded to the Court pursuant to their *ex parte* conversation on February 26, 2019.

recordings of two conversations between the defendant and Figueredo, which the defendant had denied having. *Caron*, too, is therefore distinguishable from this case.[17]

First, in *Caron*, it is clear that the defendant and his attorney were given notice that prosecutors were in possession of the intercepted communications, and the trial court at least gave counsel an opportunity to be heard and to register an objection before permitting prosecutors to confront the defendant with the evidence. Here, by contrast, prosecutors alerted the Court to the government's possession of the wiretap evidence *ex parte*, and defense counsel was never given an opportunity to listen to any of the relevant calls or review any transcript; he was not even advised that the evidence existed. From a due process perspective, and pursuant to New York's surveillance laws, this was clearly improper and constitutes reversible error. *See also United States v. Manuszak*, 438 F. Supp. 613 (E.D. Pa. 1977) (probation may not be revoked upon the basis of court-authorized wiretap evidence without first giving the probationer an opportunity to litigate the validity of the wiretap).

Section 700.70 of the CPL provides that the contents of any intercepted communication, or evidence derived therefrom, may not be received in evidence or otherwise disclosed at a defendant's trial unless the People, within 15 days after the defendant's arraignment and before the commencement of trial, provide the defendant with a copy of the eavesdropping warrant, and accompanying application, which authorized the interception of the communications. Further,

---

[17] The People also apparently relied on the Second Department's decision in *People v. Jinsong He*, 291 A.D.2d 413 (2d Dept. 2002), where the appellate division approved the prosecutor's use of illegally-recorded conversations on rebuttal to impeach the credibility of defense witnesses, but this decision, too, provides little guidance for this Court. *Jinsong He* offers virtually no factual discussion and appears to have been a case where the illegal recording at issue was made by a civilian, and not by, or at the behest of, any government actor. *See, e.g., People v. Clark*, 19 Misc.3d 6, 8 (Sup. Ct. App. Term. 2008) and *People v. Hughes*, 124 A.D.344 (3d Dept. 1986). Moreover, the court in *Jinsong He* gave the jury careful instructions on how to consider the recorded conversations.

the statute only authorizes a trial court to extend this 15-day period upon "good cause shown" where the court finds that the defendant will not be prejudiced by the delayed receipt of such papers. *See People v. Schulz*, 67 N.Y.2d 144 (1986) (stating there must be "strict compliance" with New York's eavesdropping statute). *See also People v. Cruz*, 34 N.Y.2d 362, 369 (1974) ("To use, without notice to the defendant, evidence derived from electronic surveillance is impermissible, even if the surveillance itself is legal."). In this case, the Court made no finding of good cause, nor did it determine that the Defendant would not be prejudiced by permitting the prosecution to use the intercepted communications. Much to the contrary, the prejudice to the Defendant was immense, and it was certain.

On February 25, 2019, in the middle of trial, the District Attorney's Office elected to terminate the wiretap investigation and execute a search warrant upon a home where, according to defense witnesses, the Defendant was living with Christopher White and members of his family. The following day in court, February 26, 2019, the People then advised the Court that the People's investigation had concluded, that Judge Sullivan had ordered the intercepted communications unsealed, and that the People were therefore seeking to use the communications on cross-examination and rebuttal, notwithstanding their assertion just one day earlier that, "no matter what happens here, this information is not going to be used by [the trial assistants] in cross-examination" (2/25/19 Ex Parte App.: 3).[18] Without conducting a hearing, without pausing the proceedings to review the search warrant application and affidavits, without reviewing any

---

[18] This assertion by the prosecution—namely, that the intercepted communications were not going to be used by the trial assistants no matter what happened—is particularly concerning given the fact that prosecutors had already made the strategic determination to terminate the wiretap. The search warrant, after all, was signed by Judge Sullivan at 11:35 a.m. on February 25, 2019, around the same time—if not prior to—the government's first request for an *ex parte* conference with the Court.

transcripts, and without at the very least even alerting defense counsel to the nature of the People's request or to their access to this new and potentially devastating evidence, the Court summarily granted the People's request and indicated it would simply consider the propriety of cross-examination as the testimony unfolded.   Clearly, this was error, and it rendered the Defendant's trial fundamentally unfair. *See People v. Pobliner*, 32 N.Y.2d 356 (1973) and *People v. Cruz*, *supra* (stating a trial court may, where appropriate, hold a hearing during trial, outside the presence of the jury, to determine the propriety of using certain wiretap evidence). *See also O'Brien v. United States*, 386 U.S. 345 (1967) and *Black v. United States*, 385 U.S. 26, 31 (1966) (remanding matters for new trials where eavesdropping evidence was used at trial without defendant's knowledge in order to ensure defendants received a fair trial).

Second, and as will be more fully discussed *infra* in Point Two, prosecutors in this case did not simply impeach the defendant's credibility, as they did in *Caron*, by confronting him with intercepted statements he made that contradicted his trial testimony and tended to either raise doubt about his credibility or demonstrate that he had perjured himself.[19]   Indeed, the Defendant did not testify.   Rather, prosecutors confronted defense witnesses with recorded conversations that the witnesses allegedly had with the Defendant and questioned them about their knowledge that the Defendant, on trial for possessing drugs and guns, also *sold* drugs and guns, that he paid witnesses to lie about where he lived, and that he was also found in possession of an additional quantity of drugs pursuant to the execution of a search warrant.   Thus, in this respect, too, the Defendant's case is clearly distinguishable from *Caron*.

---

[19] *See United United States v. Baftiri,* 263 F.3d 856, 856 (8th Cir.2001); *United States v. Echavarria–Olarte,* 904 F.2d 1391, 1397 (9th Cir.1990*); United States v. Vest,* 813 F.2d 477, 484 (1st Cir.1987) (holding that wiretap evidence, even if invalid, is admissible to impeach *defendant's* testimony).

In sum, prosecutors went far beyond impeaching the Defendant's credibility. Instead, they used unchallenged wiretap evidence to impeach the credibility of defense witnesses and at the same time introduced evidence that the Defendant committed other uncharged crimes. And, they did so without any notice whatsoever to the defense. The prejudicial effect of the undisclosed wiretap evidence was, in other words, insurmountable, it denied the Defendant his due process right to a fair trial, and its erroneous admission, therefore, cannot be dismissed as harmless.

### POINT TWO

**EVEN IF THE GOVERNMENT'S USE OF THE UNDISCLOSED INTERCEPTED COMMUNICATIONS WAS PERMISSIBLE FOR LIMITED IMPEACHMENT PURPOSES, ALLOWING THE PEOPLE TO USE THE UNNOTICED RECORDINGS TO INTRODUCE EVIDENCE OF DEFENDANT'S UNCHARGED CRIMES—AGAIN, WITHOUT GIVING DEFENSE COUNSEL ANY OPPORTUNITY TO BE HEARD— VIOLATED THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST. AMEND IV; N.Y. CONST. ART. I, § 6.**

**A.      The Court permitted the People to improperly question Mitchell Green about whether Defendant sold drugs and guns.**

Here, through her questioning of Mitchell Green on cross-examination, the prosecutor suggested that the Defendant was a drug dealer approximately 14 times, and even suggested that the Defendant likewise sold guns. Green, however, disputed the number of times that he had recently communicated with the Defendant on the phone, and not the substance of any such communications (Green: 1149-50). Thus, even assuming that the use of the intercepted communications might have been permissible to properly impeach Green's credibility, the prosecutor could have simply confronted him with specific times and dates of Green's recorded conversations with the Defendant, without simultaneously—and intentionally—putting before

the jury evidence of the Defendant's uncharged crimes. Evidence of these uncharged acts would not have been admissible pursuant to a timely *Molineux*, *Sandoval*, or *Ventimiglia* application, nor would such evidence have been admissible on the theory that the defense somehow opened the door to its admission absent a ruling from the court outside the presence of the jury with an opportunity for defense counsel to be heard. Accordingly, for this reason, too, even if the government's use of the intercepted communications was, under the circumstances, permissible for impeachment purposes, allowing the prosecutor to use the transcripts to introduce uncharged crimes evidence against the Defendant through defense witnesses, without giving defense counsel any opportunity to be heard, violated the Defendant's right to a fair trial.

"Evidence of similar uncharged crimes has probative value, but as a general rule it is excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past." *People v. Alvino*, 71 N.Y.2d 233, 241 (1987). *See also People v. Arafet*, 13 N.Y.3d 460, 464 (2009). This "rule reflects the importance of an accused being judged only on relevant, probative evidence, rather than on the basis of propensity to commit crime." *People v. Agina*, 103 A.D.3d 739 (2d Dept. 2013), *quoting People v. Gillyard*, 13 N.Y.3d 351, 355–356 (2d Dept. 2012). Nevertheless, evidence of other crimes may be admissible when the evidence is relevant to a material issue in the case other than the defendant's criminal propensity, such as motive, intent, the absence of mistake or accident, a common scheme or plan, or the defendant's identity. *See People v. Molineux*, 168 N.Y. at 293. *See also People v. Holden*, 82 A.D.3d 1007 (2d Dept. 2011). Still, even where relevant, uncharged crime evidence may only be introduced against a defendant where the court, after careful consideration, concludes that the probative value of the testimony as it relates to the

crimes charged exceeds the potential for prejudice to the defendant. *People v. Cook*, 93. N.Y.2d 840, 841 (1999).

Moreover, while a witness may generally be cross-examined with respect to any immoral, vicious, or criminal act which may affect his or her character and show that the witness is unworthy of belief, provided that the cross-examiner questions the witness in good faith and upon a reasonable basis in fact, *see People v. Brown*, 103 A.D.3d 912 (2d Dept. 2013), the People may not attempt to impeach the credibility of a defense witness with regard to a collateral matter. *People v. Harper*, 220 A.D.2d 450 (2d Dept. 1995); *People v. Beniquez*, 215 A.D.2d 678 (2d Dept. 1995).

Here, identifying the Defendant as the perpetrator of other bad acts – namely, as the seller of guns and drugs – had little bearing on whether or not he committed the crimes charged in the indictment (other than, of course, to simply suggest that he was a criminal), and doing so was certainly not necessary to prove any element of the People's case, especially in light of the other evidence that was available to prosecutors to prove the "intent to sell" element of the charged crimes, including the weight and quantity of the drugs recovered, and the recovery of digital scales (Miller: 294; 308, Corry: 610-11; 613-14; 624-25; 638-39; 692), large sums of money (Cook: 100; 115; 120, Franzone: 507, Corry: 554-55; 557; 561-62; 597-99; 703), and other packaging paraphernalia.

Moreover, the People could have impeached Green's testimony that his communications with the Defendant were infrequent without presenting the jury with evidence that the Defendant had also committed other uncharged crimes. However, given the Court's license to the People to use the intercepted communications at will, and the Court's declination to give defense counsel

35

any notice of the wiretap evidence, the prosecutor simply used Green to suggest to the jury that the Defendant was a drug dealer, and the jury was presented with evidence that the Defendant, in addition to possessing guns and drugs—and to also having been arrested for possessing fraudulent identification documents—likewise sold guns and drugs.[20] This testimony had an impermissible piling on effect, it created the overwhelming impression that the Defendant was a drug dealer, and it irreparably prejudiced the Defendant's right to a fair trial.

**B.     The Court improperly permitted the People to question Christopher White about whether a large quantity of drugs was recovered from the home where he claimed to live with the Defendant, pursuant to the execution of a search warrant.**

The Court of Appeals has held that when deciding whether a defendant has 'opened the door' to otherwise inadmissible evidence, the trial court should consider whether, and to what extent, the evidence or argument that is said to have opened the door is incomplete and misleading, and what if any otherwise inadmissible evidence is reasonably necessary to correct the misleading impression. *People v. Massie*, 2 N.Y.3d 179, 184 (2004); *see also People v. Rosario*, 17 N.Y.3d 501 (2011) (counsel's use of the word 'story' during her opening statement, even if suggesting a recent fabrication, did not create a misleading impression that opened the door for the People to elicit evidence on their direct case that alleged sexual abuse victim had complained about the defendant in a note to her boyfriend); *People v. Richardson*, 95 A.D.3d 1039 (2d Dept. 2012) (reversing conviction where trial court erroneously ruled defendant opened the door to otherwise inadmissible hearsay); *People v. Fisher*, 104 A.D.3d 868 (2d Dept. 2013)

---

[20] And, notwithstanding the Court's devastating evidentiary rulings, the Court exacerbated its error by giving jurors no limiting instructions whatsoever to alleviate the prejudice of the admission of other crime evidence, either at the time the testimony was elicited or later in its final charge. Even in the absence of a request by defense counsel, this, too, was error. *See People v. Rembert*, 124 A.D.3d 805 (2d Dept. 2015); *People v. Yusef*, 104 A.D.3d 881 (2d Dept. 2013); *People v. Holden*, *supra* (prejudicial effect of other crime evidence properly minimized where trial court instructed jury on limited evidentiary significance of evidence with respect to the crimes charge).

(defendant did not open door to cross-examination concerning former students' allegations that defendant had acted inappropriately toward them in a sexual way where counsel asked defendant, in reliance on pre-trial ruling, whether defendant had ever been accused of having an inappropriate sexual relationship with a student).

Here, by the time Christopher White took the stand for the defense, the prosecutor had suggested to the jury, *at least 14 times*, through her cross-examination of Green, that the Defendant sold drugs to Green and was in fact a drug dealer. Counsel then, as a means of countering this highly prejudicial testimony, asked White whether, during the time in which he lived with the Defendant at 12 Anna Avenue, he had ever seen suspicious people come to the house to buy drugs from the defendant (White: 1193). The Court overruled the prosecutor's objection to counsel's question, and permitted White to answer that he never had, but pursuant to a brief bench conference, the court then permitted the prosecutor to ask White whether he was aware that a search warrant was executed at 12 Anna yesterday and that a large quantity of drugs were recovered from the location (White: 1194). In response, White answered that he was aware that a warrant was executed but that he had no idea about what if any drugs were recovered (Id.). The Court noted counsel's objections, but maintained that defense counsel had opened the door to the testimony about the warrant by asking whether or not White had ever seen the Defendant selling drugs out of the location (Proceedings: 1196-97). The Court's ruling was wrong for three reasons.

First, as was the case with Green, the court improperly permitted the prosecutor to impeach White about a collateral matter, *see Harper* and *Beniquez*, *supra*, and to also, at the same time, admit evidence that the Defendant had committed yet another uncharged crime –

possession of a large quantity of drugs at a house where, according to the theory the defense was presenting to the jury, the Defendant lived at the time of the September 24, 2016 fire at 275 Miller Avenue. *See also* (2/26/19 Ex Parte App: 2) (prosecutor stating that the investigation had been terminated "with certain events that are not related to" the Defendant's trial).   Neither White nor the Defendant had yet been charged with possessing the drugs, multiple people were living at 12 Anna Avenue at the time the warrant was executed, there was no information presented as to where the drugs were recovered or which individuals had dominion and control over which areas of the home, and counsel had been no opportunity to litigate the propriety of the warrant.   Thus, inquiring about the warrant introduced an exceedingly prejudicial collateral matter into the trial, which could only have confused the jury and caused harmful speculation. Second, defense counsel accurately pointed out that by repeatedly asking Green whether the Defendant sold drugs, the prosecutor had improperly suggested to the jury that Green had actually witnessed the Defendant conduct hand to hand transactions, and it was therefore fair response for defense counsel to ask White whether he had ever seen the Defendant sell drugs. Third, defense counsel's question did not open the door to evidence of the search warrant.   The fact that a search warrant was executed at the house and drugs were recovered did not in any way contradict or impeach White's assertion that he had never seen the Defendant sell drugs, nor was evidence of the warrant's execution necessary to correct or clarify misleading or incomplete testimony.   *See People v. Wallace*, 31 A.D.3d 1041 (3d Dept. 2006) (defendant's cross-examination of drug enforcement agent regarding credibility of confidential information did not open door to identifying defendant on redirect examination as second source of drugs for CI's regular narcotics dealing, and error was not harmless); *People v. Melendez*, 55 N.Y.2d 445

(1982) (defendant's cross-examination of police officer as to whether he considered prosecution witness a suspect did not open the door to hearsay testimony that a concerned citizen informed the officer two days after the shooting that defendant had participated in the crime).  Rather, to reiterate, evidence that an additional quantity of drugs was recovered pursuant to a search warrant simply introduced another collateral matter into the trial and invited the jury to speculate about the scope of the Defendant's criminal dealings, which, given the evidence, apparently extended beyond the crimes charged in the indictment.

In sum, the court's conclusion that counsel opened the door to evidence of the search warrant by asking whether White had ever seen the Defendant sell drugs was, from an evidentiary perspective, clearly erroneous; it permitted the People to impeach White on a collateral matter; it permitted the introduction of an additional uncharged criminal act; and it contributed to the deprivation of the Defendant's right to a fair trial.

### C.   The Court improperly permitted the People to re-call Samuel Gibson for continued cross-examination for the purpose of eliciting that the Defendant paid him to lie on the stand.

At the conclusion of Gibson's testimony, as the People were preparing to execute the search warrant at 12 Anna Avenue, prosecutors directed that Gibson be arrested and charged him with perjury. Then, after the defense rested its case, the court permitted the People to re-call Gibson for "continued cross-examination" and to elicit that he had been arrested, that the Defendant had paid him to lie at the trial about notarizing the lease agreement, and that he had, therefore, agreed to plead guilty to a misdemeanor perjury charge in exchange for a non-jail sentence (Proceedings: 1203-04).[21] This, too, was an erroneous exercise of the Court's

---

[21]   Initially, when prosecutors alerted the Court that they were seeking to re-call Gibson in order to confront him

discretion.   The proper remedy was to simply strike Gibson's testimony, instruct jurors to disregard the testimony in its entirety, and allow the government to pursue appropriate perjury prosecutions.

A trial court may, in its discretion, strike the testimony of a prosecution or a defense witness in a variety of situations, *see, e.g.*, *People v. McConville*, 55 Misc.3d 501 (Sup. Ct. Bronx Co. 2017) (striking testimony of a prosecution witness in its entirety where prosecutor had an unauthorized conversation with the witness, who was already testifying, without seeking permission from the judge); *United States v. Rosario Fuentez*, 231 F.3d 700 (10th Cir. 2000) (striking testimony of a defense witness who admitted to handling cocaine and then invoked the Fifth Amendment); *People v. Durrant*, 173 A.D.3d 890 (2d Dept. 2019) (striking testimony of defense witness that defendant had good reputation in the workplace as irrelevant in prosecution for sexual abuse); *Taylor v. Illinois*, 484 U.S. 400 (1988) (striking defense witness's testimony where defense counsel willfully failed to identity the witness to the government prior to trial), and here, striking Gibson's testimony—as even prosecutors initially recognized (Proceedings: 1200)—was the appropriate sanction for the Defendant's alleged illegal conduct.   Indeed, striking Gibson's testimony and giving jurors a stern instruction to disregard it would have preserved the integrity of the trial without forfeiting the Defendant's right to have the jury fairly adjudicate his guilt with respect to the crimes charged in the indictment.   The Court, however, permitted the People to recall Gibson to the stand, after the People negotiated a plea deal with

---

with certain communications they had intercepted on the wire, the court assigned Gibson an attorney, who, after speaking with Gibson, advised the Court that Gibson would invoke his Fifth Amendment right to remain silent in response to each and every question asked of him and that it would therefore be improper for him to be recalled (Proceedings: 1167-70; 1199-1200).   Nevertheless, unsatisfied with sanction of striking Gibson's testimony and instructing the jury to disregard it in its entirety (Proceedings: 1200), prosecutors instead struck a deal with Gibson during the overnight recess, allowing Gibson to plead guilty to a misdemeanor with the promise of no jail on the condition that he re-take the stand and admit that the Defendant paid him to lie (Proceedings: 1203).

him, and to put before the jury evidence that the Defendant had committed yet *another crime*—

namely, that he paid a defense witness to lie for him—and that this crime, too, was captured on a

recorded intercepted phone call between Gibson and the Defendant, which, like the other calls

utilized by prosecutors, was never made available to counsel (Gibson: 1212-15).  This, too, was

error, the Defendant's trial was, as a result, unfair, and the verdict must, therefore, be set aside.

**D.** **Even if each of the errors with respect to Green, White, and Gibson do not, independently, constitute reversible error, when considered cumulatively, they combined to deprive the Defendant of his due process right to a fair trial.**

While some errors, standing alone, are insufficient to warrant reversal of a defendant's

conviction, the cumulative effect of a series of such errors can nevertheless work to effectively

deprive a defendant of his constitutionally guaranteed right to a fair trial.  *People v. Mattocks*,

100 A.D.3d 930 (2d Dept. 2012); *People v. Andre*, 185 A.D.2d 276 (2d Dept. 1992) (finding

cumulative effect of errors deprived defendant of a fair trial); *People v. Sepulveda*, 105 A.D.2d

854 (2d Dept. 1984) (cumulative effect of errors, including trial court's failure to permit

impeachment on a critical issue and prosecutorial improprieties deprived defendant of a fair

trial); *People v. Stewart*, 153 A.D.2d 706 (2d Dept. 1989) (cumulative effect of violations of rule

against collateral impeachment compromised defendant's right to a fair trial).  Here, the court

erred by allowing the prosecutor to repeatedly ask Green whether the defendant sold drugs and to

also ask whether he sold guns; it erred by permitting the prosecutor to ask White about the search

warrant; and it further erred by permitting the prosecutor to conduct continued cross-examination

of Gibson (after the defense rested) for the purpose of eliciting the fact that the Defendant had

paid him to lie.  Moreover, the Court gave no limiting instructions to the jury concerning the use

of this evidence, at all.  Thus, when considered together, these errors—even if somehow

harmless considered in isolation—combined to deprive Appellant of his right to a fair trial.

## **CONCLUSION**

There is no gainsaying that arriving at the truth is a fundamental goal of our legal system." *United States v. Havens*, 446 U.S. 620, 626 (1980). There are, however, constitutional rules that limit the means by which the government may conduct its search for the truth. *See James v. Illinois*, 493 U.S. 307, 311 (1990). Here, those limits were pushed beyond their bounds, and as a result, the Defendant's conviction is constitutionally infirm. Therefore, for all of the foregoing reasons, the jury's verdict must be set aside, and a new trial ordered.

Dated: August 9, 2019
      Garden City, New York 11530

                                   Respectfully submitted;

                                   Barket Epstein Kearon Aldea
                                   & LoTurco, LLP

By: _____
                                   Danielle Muscatello
                                   666 Old Country Road, Suite 700
                                   Garden City, New York 11530
                                   (516) 745-1500

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU: CRIMINAL TERM, PART 47
-------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                    AFFIDAVIT OF SERVICE

              -against-
                                                    Indict. No. 43N-2018
TONY MCCLAM,

                        Defendant.

-------------------------------------------------------------------------X
STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NASSAU           )

Don Taylor, being duly sworn, deposes and says, under the pains and penalties of perjury, the
following is true:

     1.    I am over eighteen (18) years of age, not a party to the above-captioned case, and
reside in Bronx County, New York.

     2.    On August 9, 2019, I served a true copy of within **MOTION TO SET ASIDE
THE VERDICT** by depositing same in a postpaid properly addressed wrapper, in a post office
or official depository of the United States Postal Service within the State of New York,
addressed to the last known address of the addressee and by electronic mail as follows:

     Madeline Singas
     Nassau County District Attorney
     262 Old Country Road
     Mineola, New York 11501

                                                    Don Taylor

Subscribed and sworn to before me
this 9th day of August, 2019

Notary Public

SUZANNE M. ODONOGHUE
NOTARY PUBLIC, State of New York
No. 01OD6289480
Qualified in Suffolk County
Commission Expires Sept. 30, 2021

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU: CRIMINAL TERM, PART 47
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK


            -against-

TONY MCCLAM,
                                          Indict. No. 43N-2018
                                          (Hon. Howard Sturim)

                        Defendant.
-----------------------------------------------------------------------X




NOTICE OF MOTION TO SET ASIDE VERDICT PURSUANT TO CPL §330.30(1)




BARKET, EPSTEIN, KEARON, ALDEA LOTURCO, LLP

Attorneys for Defendant
666 OLD COUNTRY ROAD
SUITE 700
GARDEN CITY, NEW YORK 11530
(516) 745-1500